NEW ENGLAND OIL REFINING CO. et al. v. WILTSEE et al.

(Circuit Court of Appeals, First Circuit. January 6, 1925.)

No. 1753.

1. Corporations ⊜⟿448(1)—Corporation held bound by contract made in its behalf before organization.

Claimant and a firm entered into a contract to form a corporation to own and develop oil properties in Central and South America, which were to be selected and brought in by claimant, who was an experienced oil engineer. Claimant was to receive 10 per cent., and the firm 90 per cent., of "vendors' shares" to be issued by the corporation. It was organized by the firm, which controlled its affairs and members of which became its officers. Claimant investigated and secured the properties which were conveyed to the corporation and formed the basis for its capital stock. Held, that the contract was made on behalf of the corporation and not of the firm; that the corporation had

knowledge of it through its officers and was bound by it, having accepted its benefits; and that claimant was entitled to a judgment against it for the value of the stock which it failed to issue to him.

2. Corporations ⊜⟿98—Measure of damages for breach of contract to deliver stock stated.

The measure of liability of a corporation for failure to deliver stock to one entitled to it under a contract is the value of the stock at the time it should have been delivered where it then had a market value, and the liability cannot be satisfied by a tender of the stock after it has become worthless.

Appeal from the District Court of the United States for the District of Massachusetts; George W. Anderson, Judge.

Suit in equity by Henry S. Parker against the New England Oil Corporation, in which Ernest Wiltsee and others intervened. The New England Oil Refining Company and others appeal from a decree allowing the claim of Ernest Wiltsee against defendant. Affirmed.

Robert G. Dodge, of Boston, Mass., for appellants.

Sherman L. Whipple, of Boston, Mass. (William Gates, Jr., and Frederick Foster, both of Boston, Mass., on the brief), for appellees.

Before BINGHAM and JOHNSON, Circuit Judges, and HALE, District Judge.

HALE, District Judge. This case arises under equity proceedings in the United States District Court for the District of Massachusetts, in No. 1747, Henry S. Parker v. New England Oil Corporation.

On July 14, 1922, the bill in equity was filed. The respondent the New England Oil Corporation appeared and admitted that it was unable to pay its creditors. On July 20th receivers were appointed. Proceedings then rested until January 8, 1923, when a decree was entered fixing January 24, 1923, as the limit of time for proof of claims. On January 9, 1923, a "noteholders' committee" of six appeared, in order to take all steps possible to protect the interests of the noteholders. This committee obtained leave to intervene in the suit. Soon after, they presented a plan for acquisition of assets and distribution of securities under a "Plan for Readjustment and Reorganization." On February 17, their "Modified Plan of Reorganization" was filed, and a decree entered authorizing the receivers to participate in the same. On February 26, 1923, Ernest Wiltsee ap-

peared, obtained permission to intervene, and filed his claim. The committee of noteholders appeared in opposition to the claim. In the meantime, the New England Oil Refining Company had been organized, apparently as a reorganization, by the noteholders' committee. Hearing upon the Wiltsee claim was had in the District Court, late in May, 1923. On June 27, 1923, a decree was filed by the District Court, Judge Anderson sitting, allowing the claim for $176,000. An appeal was taken from this decree by the noteholders' committee and the New England Oil Refining Company. Upon this appeal the case is now before us.

Wiltsee's claim is briefly stated by his counsel to be substantially: That the defendant the New England Oil Corporation was organized in pursuance of an arrangement between himself and a firm known as Cochrane, Harper & Co., to develop a joint enterprise, after organization, and agreed to issue and deliver "vendors' shares," so called, representing promotors' profits; 90 per cent. of such shares to go to Cochrane, Harper & Co. for financing the enterprise, and 10 per cent. to go to Wiltsee for bringing in the properties which were the basis of the enterprise; that the corporation failed to deliver Wiltsee's shares to him; and therefore he has a claim against the corporation for their value at the date when the shares should have been delivered.

The appellants say, in substance, that their contentions—set forth fully in their assignment of errors—may be summarily stated as follows:

(1) The District Court erred in ruling that the New England Oil Corporation was under an obligation to issue a part of its shares to Wiltsee, and that, not having done so, the latter has a provable claim in the receivership proceedings.

(2) Even if a claim against the New England Oil Corporation existed, the District Court erred in fixing its amount.

[1] Under the first contention, the appellants urge that Wiltsee's claim, if any, was against Cochrane, Harper & Co., and not against the corporation; furthermore, that the District Court erred in the construction which it placed upon the term "vendors' shares."

The proofs show that in 1919 the claimant, Ernest Wiltsee, had been a mining engineer for some 30 years, and had large experience in connection with mining, oil, and kindred properties; that he was familiar with conditions and methods of doing such business in Central and South America; that he knew the Spanish language and was acquainted with the characteristics of the peoples in those countries, and with the best way to negotiate with them; that Cochrane, Harper & Co., called the firm, were bankers interested in bringing out and organizing oil companies; they maintained offices in New York and Boston; Wiltsee had dealt with them prior to January, 1920, in connection with securing oil contracts for them in Mexico; prior to January, 1920, Wiltsee had expressed to the firm his belief that the Mexican oil fields would soon become exhausted, and that he thought it would be a good thing to investigate new oil fields in South America, where he believed large holdings could be acquired at small cost; that there were very good opportunities in Venezuela and Colombia, possibly also in Ecuador; he brought to the firm's attention certain South American properties controlled by one Restrepo and associates, as a result of which the firm entered into an arrangement which contemplated the organization of a corporation by the firm to exploit the properties and a division of promoters' stock in the proportion of three-fourths to the firm and one-fourth to Restrepo and his associates; the firm requested Wiltsee to visit South America, not only to examine the Restrepo properties but to find and investigate other properties.

Before Wiltsee set out for South America, he and the firm entered into a certain agreement. With reference to what each party was to do under the agreement so made, the District Court has found these facts: "It was his (Wiltsee's) part to find, examine and negotiate for the properties, out of the exploitation of which all the parties expected to reap large rewards. It was the part of Cochrane, Harper & Co. to obtain money from the investing public and to provide and control the legal and financial machinery necessary for the development of the enterprise. But Wiltsee was much more than a hired engineer; he was a participant in the risks and in the expected profits of the enterprise. Cochrane, Harper & Co. were the chief or managing promotors. Wiltsee so treated them. He expected them to create, and for a time to control, the corporation through which their common interests were to be worked out. * * * *"

"It is clear that the bankers expected to get from the investing public all their cash disbursement made in connection with the

acquisition of the properties, the development thereof, or the purchase and installation of machinery and other necessary appliances. It is also clear that the 'vendors' shares' were intended to represent most of the prospective profits of the enterprise."

Wiltsee remained in South America from January to June, 1920. While there, he examined properties, negotiated for concessions, and dealt with other matters relating to the promotion of the company; brought to the enterprise ten properties, which, from time to time, were transferred to the defendant corporation. These properties are found by the District Court to have "formed the chief basis of such hope of prosperity as the defendant corporation now has."

Was the New England Oil Company under any obligation to issue any shares of its stock to Wiltsee? Plainly it was not under such duty if the appellants are correct in saying that the contract was the contract of the firm alone, and not one which the parties contemplated that the corporation, when organized, should carry out.

The proofs show that the South American oil fields were the discovery of Wiltsee, who asked the firm, as bankers, to assist him in financing the venture. We are satisfied that the corporation was created for the purpose of developing this enterprise. From the uncontradicted testimony of Wiltsee, and from the other proofs, we are persuaded that the agreement was intended to be that the firm should see that a corporation was organized as a means of issuing what were called "vendors' shares," such shares to be divided by the corporation between the firm and Wiltsee. It appears that Wiltsee and the firm reached an oral understanding in January, 1920. After this agreement was made, and before starting for South America, Wiltsee drafted a letter in which he intended to express the agreement in general terms, as he understood it; and it appears to be uncontradicted that this draft, though unsigned, states the general terms of the agreement as follows:

"With regard to South American properties to be secured from Messrs. Restrepo, Leonard & Donnen, as you have secured this proposition for us we agree that you will receive ten per cent. (10%) of the vendors' shares in the holding company to be formed, and financed to receive these properties."

The proofs and the conduct of the parties show that this agreement applies, not only to properties of Restrepo, Leonard & Donnen, but to the other properties which Wiltsee investigated and brought to the attention of the firm. We think the words "you will receive ten per cent. (10%) of the vendors' shares" imply an obligation of the firm to see that the corporation was to deliver the shares, and not merely that the firm bound itself to so deliver them.

Judge Anderson in the District Court had before him all the witnesses. He had an opportunity to examine Wiltsee carefully, and found that he appeared to be a man of high character, "careful and accurate in his statements." The firm did not see fit to contradict him by any affirmative testimony of the partners.

When the corporation was formed, the 440,000 "vendors' shares" were all given to the firm. Cochrane, Harper & Co. clearly controlled the corporation and became its officers; they brought to the corporation all their knowledge of the agreement which they had made with Wiltsee in its behalf. We think Judge Anderson was correct in finding: "There is no doubt whatever that at all times now material Cochrane, Harper & Co. dominated the defendant corporation. It was their creature. They held at all times now material a great majority of the stock; they were, or named, its executive officers. On all the evidence I find that their knowledge of Wiltsee's rights was the knowledge of the corporation. It follows that in June, 1920, as well as later, the corporation knew Wiltsee was entitled to receive 10 per cent. and Cochrane, Harper & Co. 90 per cent. of the vendors' shares. Construing the dealings between Wiltsee and Cochrane, Harper & Co., in the light of the surrounding circumstances, I think, and therefore find and rule, that the real contract was that the corporation, when formed, should divide its vendors' shares between them in the above proportions (90 per cent. to Cochrane, Harper & Co., and 10 per cent. to Wiltsee); and that the corporation took over the Venezuelan properties charged with the duty of issuing the vendors' shares in that proportion. * * * What he (Wiltsee) was to receive was, not payment from the bankers, but participation in the shares to be issued by the holding company which the bankers were to cause to be formed to take and exploit the properties that Wiltsee had found, examined and negotiated for. He expected, and had a right to expect, the bankers to use their official powers with the contemplated corporation so that he, as subpromoter, would re-

ceive from the corporation his proportion of the stock issued for the properties that he had secured for the enterprise."

It appears that in January, soon after the agreement had been made, Wiltsee wrote out the draft letter upon which we have commented, and which is substantially admitted to be a correct statement of the terms of the agreement. The firm, however, did not sign the letter, and, upon Wiltsee's return, he applied to the firm to have the substantial agreement carried out; he was put off from time to time. It also appears that he afterwards had an interview with Cochrane and accepted a compromise arrangement, not because the firm disputed the terms of the agreement, but because the partners thought he ought to be satisfied with something less than the agreement, and that "times were hard." After this interview, Cochrane wrote a letter, in which there was a statement that the firm would use its influence with the board of directors to make a settlement. Soon after receiving this letter Wiltsee went abroad again and remained until late in September, 1921. Upon his return, he found the company in the hands of receivers, and that, under his agreement, he was compelled to look to a corporation in trouble. He then made a direct claim upon the firm by his letter of November 27, 1922, charging the firm with having abandoned the agreement, and saying that he would "look to Cochrane, Harper & Co. for compensation" for the work he did on behalf of the corporation. We think this letter should not be held to be an abandonment of his rights under the agreement; it was based upon an incorrect view of his own rights; he should not suffer for having adopted that view; his statements in the letter could not change the rights of the parties, as already fixed. It appears also that Wiltsee had not then learned that the vendors' shares, to 10 per cent. of which he was entitled, had been issued and delivered to Cochrane, Harper & Co.; and that he never knew these facts until they were disclosed at the hearing in the District Court.

We are of the opinion that the agreement made by Wiltsee with the firm, when he brought the oil properties to its attention, was one made in distinct contemplation that the corporation, when organized, should carry out; and that in fact the corporation had knowledge of the agreement and adopted it. The agreement clearly gave Wiltsee the right to claim 10 per cent. of the "vendors' shares" in the holding company to be formed. The corporation issued 440,000 shares, but gave none to Wiltsee.

Sharp contention is made that the term "vendors' shares" has a technical meaning, and that the rights of Wiltsee to these shares should be governed by the technical rules of English courts and of other courts touching the meaning of the term "vendors' shares." We think there is no merit in this contention. The shares intended to be conveyed were one-tenth of the shares issued under the agreement. It was admitted on all sides that the 440,000 shares are the shares referred to as the "vendors' shares"; they might as well be called "prospectors' shares," or have been spoken of under any other designation. The material thing is that the 440,000 shares were the shares intended to be divided, 10 per cent. to Wiltsee and 90 per cent. to the firm, and that they were the shares that the firm and Wiltsee had in mind when they made the agreement. The proofs lead us to the conclusion that this division of the shares was based upon the South American oil concessions and did not include certain other properties which it appears were of much less value than these, and were not considered when the undertaking was made. We think the appellees properly insist that if evidence could be furnished which would support the appellant's contention that the 440,000 "vendors' shares" were allotted only in part on account of the Venezuelan concessions, the members of the firm would have known it; and that they were not called to testify upon the subject.

We can have no doubt that the knowledge of the agreement, which the partners of the firm had, continued to be their knowledge when they became the officers and agents of the corporation, and that it thus became the knowledge of the corporation. It then became the duty of the corporation, dominated as it was by the partners, to issue 10 per cent. of the 440,000 shares—namely, 44,000 shares—to Wiltsee; for it is clear that the company, created and controlled by the partners, accepted the benefits of the contract when they took over the South American properties and issued the stock based on such properties. The case shows, then, that the corporation wrongfully withheld from Wiltsee the shares it should have issued to him, and that it issued such shares to other persons. We think this must be regarded as a breach of the contract, and

that the appellee here is entitled to damages, as he would have been in a suit at law brought against the corporation for wrongful issuance of his shares to other persons.

The learned counsel for the appellants have brought to our attention many cases in which courts have held that when a contract has been made on behalf of a corporation to be formed, with the understanding that it should be bound, such corporation would not be liable on such contract, unless it adopted the contract by accepting benefits under it, with knowledge of its terms. Cook on Corporations, in its chapter upon contracts of this class, refers to many cases in which the courts have held corporations not to be liable upon contracts entered into by promoters, even where the corporation has received benefits from such contracts. Many other cases are referred to by Cook where the courts have held that the circumstances in each case must be examined carefully to find whether the corporation should be held to have adopted a contract made before its organization. In the case at bar it would be impossible to hold that the corporation had not adopted and assumed the contract made in its behalf by persons who became its leading officers and agents, it having accepted the properties which became the substantial part of the plant of the company, and upon which the stock of the company was issued. Simmons Creek Coal Co. v. Doran, 142 U. S. 417, 436, 12 S. Ct. 239, 35 L. Ed. 1063; Gardiner v. Equitable Office Building Corporation (C. C. A.) 273 F. 441, 17 A. L. R. 431. In Whitney v. Wyman, 101 U. S. 392, 396, 25 L. Ed. 1050, the Supreme Court had before it a case in which it found "that both parties understood and meant that the contract was to be, and in fact was, with the corporation and not with the defendants individually." And it was held that the corporation had adopted the contract.

The District Court has properly found that a contract existed between the corporation and Wiltsee, and that the record showed facts which might be held to be either a breach of the contract or a conversion; and that in any event it resulted in a right to money damages. We think a breach of the contract is proven; and that a right to money damages follows.

[2] The damages clearly should be the value of the shares at the time when they should have been delivered to Wiltsee. It is plain that Wiltsee's rights are not met by tendering the shares to him after such shares have become of no value. They were of substantial value when issued. They were listed on the Boston Stock Exchange and bought and sold in open market, between August 20, 1921, and January 22, 1922, for between $4 and $6 per share. In assessing the damages, the District Court took the lowest figure, $4 per share. To such assessment of damages we think the appellants cannot object.

The decree of the District Court is affirmed, with costs to the appellee Wiltsee in this court.