22CA0375 Peo v Quinlan 07-03-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0375
Jefferson County District Court No. 19CR1283
Honorable Laura A. Tighe, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Blake Alan Quinlan,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE SULLIVAN
Tow and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 3, 2025

Philip J. Weiser, Attorney General, Brittany Limes Zehner, Senior Assistant
Attorney General and Assistant Solicitor General, Denver, Colorado, for
Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith K. Rose, Deputy
State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1      Defendant, Blake Alan Quinlan, appeals the judgment of conviction entered on jury verdicts finding him guilty of first degree murder and other offenses arising from his shooting of the victim, Joseph Brinson. We affirm.

## I.     Background

¶ 2      Quinlan and Brinson ran in the same circle of friends. But after an altercation at Brinson's house, Quinlan, who was eighteen years old and intoxicated at the time, shot and killed Brinson. Quinlan then dismembered Brinson's body and discarded the body parts. Quinlan fled to Texas but was arrested for unrelated conduct. While in jail in Texas, Colorado investigators twice interviewed Quinlan regarding Brinson's disappearance. During the second interview, Quinlan confessed to killing Brinson.

¶ 3      The jury found Quinlan guilty of first degree murder, tampering with a deceased human body, two counts of identity theft, tampering with physical evidence, theft, and possession of a defaced firearm. The district court sentenced Quinlan to life in prison without the possibility of parole on the first degree murder count. *See* § 18-1.3-401(1)(a)(V)(A.1), C.R.S. 2024. One hundred

forty-five days after sentencing, the court ordered Quinlan to pay nearly $9,000 in restitution.

¶ 4 On appeal, Quinlan contends that the district court erred by (1) denying his motion to suppress statements from his Texas interviews; (2) omitting the statutory definitions of intoxication and self-induced intoxication from the jury instructions; (3) denying multiple motions for a mistrial; (4) sentencing him to life in prison without the possibility of parole; and (5) entering an untimely order for restitution. We address each contention in turn.

## II. Suppression of Quinlan's Statements

¶ 5 Quinlan contends that the district court erred by denying his motion to suppress the statements he made during his two interviews in Texas. He argues both (1) that the investigators failed to *Mirandize* him before his custodial interrogations, *see Miranda v. Arizona*, 384 U.S. 436 (1966); and (2) that his statements to the investigators were involuntary. We disagree with both contentions.

### A. Standard of Review

¶ 6 Whether a person is in custody for *Miranda* purposes is a mixed question of law and fact. *People v. Eugene*, 2024 CO 59, ¶ 13. We defer to a trial court's factual findings that are supported

2

by the record but review de novo the court's legal conclusions regarding custody. *Id.*

¶ 7 We apply the same standard when evaluating a trial court's order on a defendant's motion to suppress allegedly involuntary statements. *See People in Interest of Z.T.T.*, 2017 CO 48, ¶ 10.

### B. Custody Law for *Miranda* Purposes

¶ 8 "A person subjected to custodial interrogation by a law enforcement officer is afforded certain procedural protections designed to safeguard rights guaranteed by the Fifth Amendment." *People v. Garcia*, 2017 CO 106, ¶ 19 (citing *Miranda*, 384 U.S. at 478-79). To receive *Miranda*'s protections, a person must be both "in custody" and subjected to police interrogation. *Garcia*, ¶ 19. A person is in custody for *Miranda* purposes if they have been formally arrested or if, under the totality of the circumstances, a reasonable person in the suspect's position would have felt that their freedom of action had been curtailed to a degree associated with formal arrest. *Garcia*, ¶ 20.

¶ 9 This "free to leave" standard doesn't apply in the same manner, however, in the jail and prison setting. *People v. Denison*, 918 P.2d 1114, 1116 (Colo. 1996) (quoting *Cervantes v. Walker*, 589

F.2d 424, 428 (9th Cir. 1978)). If it did, all prison questioning would be considered "custodial" because a reasonable prisoner would always feel that they couldn't leave the prison freely. *Id.* Instead, we apply a "restriction" standard in the jail and prison setting, *id.* (citation omitted), analyzing whether the prisoner has experienced a change in surroundings that results in an "added imposition on his freedom of movement," *id.* As outlined in *Denison*, we consider four factors in this analysis: (1) the language used to summon the individual; (2) the physical surroundings of the interrogation; (3) the extent to which the individual is confronted with evidence of their guilt; and (4) the additional pressure exerted to detain the individual. *Id.*

¶ 10    The *Denison* factors aren't dispositive, however. *People v. Parsons*, 15 P.3d 799, 801-02 (Colo. App. 2000). We may also consider the traditional *Matheny* factors when evaluating whether a jailed person is in custody for *Miranda* purposes. *Parsons*, 15 P.3d at 801-02; *see People v. Matheny*, 46 P.3d 453, 465-66 (Colo. 2002). These factors include:

> (1) the time, place, and purpose of the encounter; (2) the persons present during the interrogation; (3) the words spoken by the

4

officer to the defendant; (4) the officer's tone of voice and general demeanor; (5) the length and mood of the interrogation; (6) whether any limitation of movement or other form of restraint was placed on the defendant during the interrogation; (7) the officer's response to any questions asked by the defendant; (8) whether directions were given to the defendant during the interrogation; and (9) the defendant's verbal or nonverbal response to such directions.

*Matheny*, 46 P.3d at 465-66 (quoting *People v. Trujillo*, 938 P.2d 117, 124 (Colo. 1997)).

¶ 11 No single factor is determinative, and a court isn't limited in the number of factors it may consider. *People v. Minjarez*, 81 P.3d 348, 353 (Colo. 2003). The "most important" consideration is whether the trial court accurately evaluated the totality of the circumstances. *Id.*

### C.     Voluntariness Law

¶ 12 The Due Process Clauses of the United States and Colorado Constitutions require that a defendant's statements be voluntary for the statements to be admissible into evidence. *See* U.S. Const. amends. V, XIV; Colo. Const. art. II, § 25; *Mincey v. Arizona*, 437 U.S. 385, 397 (1978); *People v. Raffaelli*, 647 P.2d 230, 234 (Colo. 1982). The prosecution bears the burden of proving, by a

5

preponderance of the evidence, that the defendant's statements were voluntary. *People v. Munoz-Diaz*, 2023 COA 105, ¶ 13.

¶ 13 In determining whether a statement was voluntary, we consider the totality of the circumstances and focus on whether the officer "overcame the defendant's will and brought about an inculpatory statement that was not 'freely self-determined.'" *Id.* at ¶ 14 (quoting *People v. Ramadon*, 2013 CO 68, ¶ 20). We follow a two-step inquiry when evaluating whether a defendant's statement was voluntary, asking (1) whether the police conduct was coercive and (2) whether the coercive police conduct played a significant role in inducing the statements. *Ramadon*, ¶ 20. Both steps require that we consider a wide range of non-exhaustive factors:

> 1. whether the defendant was in custody;
>
> 2. whether the defendant was free to leave;
>
> 3. whether the defendant was aware of the situation;
>
> 4. whether the police read *Miranda* rights to the defendant;
>
> 5. whether the defendant understood and waived *Miranda* rights;
>
> 6. whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;

7. whether the statement was made during the interrogation or volunteered later;

8. whether the police threatened [the] defendant or promised anything directly or impliedly;

9. the method [or style] of the interrogation;

10. the defendant's mental and physical condition just prior to the interrogation;

11. the length of the interrogation;

12. the location of the interrogation; and

13. the physical conditions of the location where the interrogation occurred.

*Cardman v. People*, 2019 CO 73, ¶ 23 (quoting *Z.T.T.*, ¶ 13).

¶ 14     Our supreme court has referred to these factors as the "*Gennings* voluntariness factors." *People v. Sanders*, 2023 CO 62, ¶ 15 (citing *People v. Gennings*, 808 P.2d 839 (Colo. 1991)).

¶ 15     When weighing these factors, we don't simply tally the factors on each side; rather, we accord them variable weight depending on the circumstances involved. *Cardman*, ¶ 27. The critical inquiry is whether, under the circumstances, the interviewing officer "actually overbore the defendant's will." *People v. McIntyre*, 2014 CO 39, ¶ 19.

## D. Additional Background

¶ 16    Investigator Tip Woodin and Investigator Elias Alberti first tried to interview Quinlan in the Texas jail in February 2019. The investigators advised Quinlan of his *Miranda* rights, but Quinlan elected not to speak with them.

¶ 17    After obtaining additional evidence linking Quinlan to Brinson's disappearance, the investigators returned to Texas two months later to try a second time. When the investigators arrived, the jail administrator asked Quinlan, "[D]o you want to go and speak with them?" Quinlan agreed. The jail administrator then escorted Quinlan to a conference room (known as the "commissioner's courtroom") in an administrative building adjacent to the jail. The jail administrator didn't observe anything to suggest that Quinlan was reluctant or unwilling to speak with the investigators.

¶ 18    Once in the conference room, the investigators recorded their interview of Quinlan, which began at 1:25 p.m. and lasted approximately eighty-two minutes. Quinlan sat at the table in the chair nearest the door, which remained closed but unlocked. Alberti sat across the table from Quinlan, and Woodin sat at the

head of the table to Quinlan's right.  Consistent with the jail's protocols, Quinlan remained handcuffed during the interview, although not chained to the table or floor.

¶ 19     Alberti began the interview by telling Quinlan he wasn't free to leave the jail facility but also said (1) if you don't want to engage, you aren't obligated "to be here with us and you don't have to answer any questions"; and (2) if "you don't want to be in the room anymore[,] . . . let us know and then we'll escort you . . . back [to the] appropriate place, okay?"

¶ 20     Alberti then relayed to Quinlan the evidence that they had gathered related to Brinson, a missing person at the time, and how the evidence linked to Quinlan.  Among other things, Alberti explained that they knew Brinson's gun and cash had been stolen; that the gun was found in Quinlan's backpack; and that Quinlan had used Brinson's credit card near the time of his disappearance. Alberti also told Quinlan that they had found Brinson's blood in the vehicle that Quinlan was driving at the time of his arrest in Texas. Quinlan admitted to taking Brinson's gun and credit card but denied any knowledge of what happened to Brinson.

¶ 21    At one point, Quinlan asked whether his explanation might be incriminating.  Alberti responded that he wasn't interested in any drug crimes but instead was interested only in finding Brinson.  At different times, the investigators encouraged Quinlan to "come clean," emphasizing, "[I]t's going to help you," and, "[I]t is in your best interest to help yourself out if there's anything . . . you've left out."

¶ 22    After the interview, the jail administrator escorted Quinlan back to the jail where he made a recorded phone call to his mother to seek her advice.  After the call, Quinlan elected to speak with the investigators again.  The jail administrator observed that Quinlan seemed "more relaxed" as she escorted him back to the investigators.

¶ 23    At the outset of the second interview, which began at 3:20 p.m., Alberti asked Quinlan what he wanted to discuss, to which Quinlan replied, "I did it."  When Alberti asked Quinlan what he did, Quinlan said, "I killed [Brinson]."  Alberti then advised Quinlan of his *Miranda* rights.  Quinlan confirmed that he understood his rights and that he still wanted to speak with the investigators.

Quinlan then detailed the events that led to him shoot Brinson and dispose of his body.

¶ 24 After a two-day evidentiary hearing on Quinlan's motion to suppress his statements, the district court issued a detailed ruling from the bench denying his motion. As relevant here, the court determined that (1) Quinlan wasn't in custody for purposes of *Miranda* during either the first interview or the second interview before Alberti *Mirandized* him, and (2) Quinlan voluntarily confessed to killing Brinson.

### E.    Analysis

¶ 25 After reviewing the record and listening closely to the interview recordings, we conclude that (1) Quinlan wasn't in custody for *Miranda* purposes during either the first interview or the beginning of the second interview, and (2) Quinlan voluntarily made his statements to the investigators.

### 1.    Custody

¶ 26 Regarding *Denison*'s first factor — the language used to summon Quinlan — the district court found, with record support, that the jail administrator "asked" Quinlan in a pleasant tone if he wanted to talk to the investigators. Quinlan agreed. Although

11

Quinlan characterizes the jail administrator's question as a "directive," no evidence at the suppression hearing suggested that the administrator commanded or ordered Quinlan to speak with the investigators. Indeed, the court found "no evidence" that anyone forced Quinlan to talk with the investigators.

¶ 27    Turning to *Denison*'s second factor — the physical surroundings of the interview — the court found, again with record support, that the investigators interviewed Quinlan in the commissioners' courtroom, not in the jail. The court described the room as an "executive hearing room" with an executive table, comfortable chairs, and three windows. *See Parsons*, 15 P.3d at 802 ("[T]he non-coercive atmosphere of a conference room" weighed against a finding of custody.). Further, the court found that the investigators spoke in a direct but conversational tone, weren't aggressive or threatening, and didn't touch or corner Quinlan. *See Marko v. People*, 2018 CO 97, ¶ 42; *Parsons*, 15 P.3d at 803.

¶ 28    Although Quinlan remained handcuffed during the interviews (albeit not chained to the table or floor), the court found that the Texas jail protocols mandated that restraint, not the Colorado investigators. *See Marko*, ¶ 41; *see also Howes v. Fields*, 565 U.S.

12

499, 513 (2012) (explaining that "special security precautions may be standard procedures regardless of the purpose for which an inmate is removed from his regular routine" and don't necessarily create a custodial situation to which *Miranda* applies). And while it doesn't weigh heavily in our analysis since Quinlan wasn't free to leave the jail facility, we note that the conference room door remained closed but unlocked, and Quinlan sat nearest the door. *See Marko,* ¶ 41 (defendant remained unblocked from the unlocked door during the interview, weighing in favor of finding no custody).

¶ 29      Regarding *Denison*'s third factor, we agree with Quinlan that Alberti confronted him with substantial evidence of his guilt, which weighs in favor of a determination that Quinlan was in custody. But this fact alone isn't dispositive. *See Marko,* ¶ 42 (confronting the defendant with evidence of his guilt in a nonaggressive manner didn't render the interview a custodial interrogation). Considering the totality of the circumstances, Alberti informed Quinlan at the outset that he wasn't obligated to answer their questions and could ask to be escorted out at any point if he didn't want to talk. *See id.* at ¶ 40; *Howes,* 565 U.S. at 515 (describing as "[m]ost important" the fact that officers informed the prisoner at the interrogation's

outset that he "could leave and go back to his cell whenever he wanted"). And at the beginning of the second interview, Alberti asked Quinlan only open-ended questions before informing him of his *Miranda* rights. *See Denison*, 918 P.2d at 1117 (noting sheriff didn't confront the defendant with evidence of guilt when using open-ended questions).

¶ 30    Moreover, the court wrapped up its *Denison* analysis on the fourth factor by finding that no one exerted additional pressures to detain Quinlan beyond the Texas jail protocols.

¶ 31    The court also made additional findings based on the traditional *Matheny* factors that cut against a custody determination. All were supported by the record. As to those findings that weren't redundant of the court's *Denison* findings, the court found:

- The first interview occurred at 1:25 p.m. (factor 1). *Cf. Howes*, 565 U.S. at 515 (interview lasting past the time when the prisoner generally went to bed supported a custody finding).

- Alberti responded to Quinlan's questions directly, without any misdirection (factor 7).

14

- The investigators said they expected Quinlan to be truthful, but they made clear he wasn't under arrest for Brinson's disappearance at that point and could stop the interview at any time (factor 8).

- Quinlan "seemed to track" the investigators' directions through his responses to questions (factor 9).

¶ 32     True, the first interview was somewhat lengthy, at just under ninety minutes (factor 5), but, again, the investigators told Quinlan in a conversational tone that he could ask to be escorted out at any time. *See People v. Davis*, 2019 CO 84, ¶ 25 (under the totality of the circumstances, questioning the defendant for almost ninety minutes didn't result in a custodial interview under *Miranda*); *cf. Howes*, 565 U.S. at 515 (while deputies interviewed the defendant for five to seven hours, with one deputy using a "very sharp tone," other factors "offset" these circumstances).

¶ 33     Quinlan argues that we should consider that he was just eighteen years old when he spoke to the investigators. But the cases on which he relies each involved determining the custodial status of juveniles, not young adults. *See J.D.B. v. North Carolina*, 564 U.S. 261, 264 (2011); *People v. N.A.S.*, 2014 CO 65, ¶ 9; *People*

15

*in Interest of R.A.*, 937 P.2d 731, 737 (Colo. 1997).  In any event, the record reflects that the court took Quinlan's age and relative youth into account.  The court also found that Quinlan possessed above-average intelligence, remained focused and oriented to his surroundings, and provided cogent answers based on a rational thought process.

¶ 34    On balance, and after weighing each of the relevant factors and considering the totality of the circumstances, we agree with the district court that Quinlan wasn't in custody for purposes of *Miranda* when he made his pre-advisement statements during the first interview and at the beginning of the second interview.[1]

¶ 35    We now turn to whether Quinlan voluntarily confessed to killing Brinson.

## 2.    Voluntariness

¶ 36    Many of the *Gennings* voluntariness factors overlap with the *Miranda* custody factors that we have already discussed.  But the

---

[1] Given our conclusion, we need not consider Quinlan's additional argument under *Missouri v. Seibert*, 542 U.S. 600 (2004), that the investigators secured his *Miranda* waiver through an invalid two-step interrogation.  *See United States v. Courtney*, 463 F.3d 333, 337 (5th Cir. 2006) (an analysis under *Seibert* is unnecessary when the suspect wasn't in custody for *Miranda* purposes).

two analyses don't duplicate one another, and custody is only one factor to consider when assessing a statement's voluntariness. *Sanders*, ¶¶ 13-15.

¶ 37 Without repeating our above custody analysis, we briefly reiterate that Quinlan wasn't in custody for *Miranda* purposes but rather remained free to terminate his interviews at any point. As a result, the investigators bore no obligation to either read Quinlan his *Miranda* rights or request that he waive those rights before he spontaneously confessed to killing Brinson. *See People v. Wood*, 135 P.3d 744, 749-50 (Colo. 2006).

¶ 38 After Quinlan spontaneously confessed, the investigators immediately advised him of his *Miranda* rights. The district court found, with record support, that Quinlan understood his rights based on his prior experience with the judicial system and that no evidence suggested that anyone coerced him into waiving his rights.

¶ 39 Quinlan also had the opportunity to speak with his mother by telephone before he decided to confess to killing Brinson; no evidence suggested that he couldn't have also sought legal counsel before confessing or that anyone limited the number of persons he could consult. After speaking with his mother, Quinlan elected to

17

reinitiate his conversation with the investigators. Although some of his statements during the first interview placed him at Brinson's house near the time of Brinson's disappearance, he volunteered his most incriminating statement — "I did it" — only after choosing to reinitiate the conversation. The record supports the court's findings that Quinlan remained "calm" and "stoic" while making his inculpatory statements, all of which were the product of a methodical, deliberate, and grounded thought process.

¶ 40     We recognize that Alberti made some comments that suggested leniency if Quinlan divulged information, such as, "[N]ow is the time to come clean" because "it's going to help you." But on the spectrum of potentially coercive promises, Alberti's assurances of potential help fall closer to "mere statements of possibility" than to specific false promises of leniency that tend to overbear a defendant's will. *People v. Smiley*, 2023 CO 36, ¶ 39; *see also People v. Perez-Rodriguez*, 2017 COA 77, ¶¶ 50-52 (detective's statements that judges and prosecutors "sometimes" have "some sort of level of compassion" for "truthful" individuals were "merely conjectures" that didn't overbear the defendant's will); *cf. Smiley*, ¶ 41 (detectives "affirmatively and without condition" saying that

18

the defendant would "be leaving the police station that day" weighed against voluntariness).  When considering Alberti's comments alongside the investigators' conversational style and the absence of any threats, we discern no coercion that induced Quinlan's statements.  *See Ramadon*, ¶ 20.

¶ 41　Accordingly, we agree with the district court that Quinlan voluntarily confessed to killing Brinson.  The court therefore didn't err by denying Quinlan's motion to suppress.

### III.　Jury Instructions

¶ 42　Quinlan contends that the district court plainly erred by omitting the statutory definitions of "intoxication" and "self-induced intoxication" from the jury instructions.  We disagree.

### A.　Standard of Review and Applicable Law

¶ 43　"We review de novo whether jury instructions adequately inform the jury of the governing law."  *Garcia v. People*, 2023 CO 30, ¶ 9.  If they do, the trial court enjoys substantial discretion in formulating the instructions and deciding whether additional instructions are required.  *People v. Theus-Roberts*, 2015 COA 32, ¶ 18.

¶ 44    Quinlan acknowledges that he didn't preserve this contention, thus limiting our review to plain error. *See People v. Garcia*, 28 P.3d 340, 344 (Colo. 2001). To rise to plain error, the error must be both obvious and substantial, meaning that it so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction. *Hoggard v. People*, 2020 CO 54, ¶ 13. A court's failure to instruct the jury properly doesn't constitute plain error when the subject of the error isn't contested at trial. *People v. Lozano-Ruiz*, 2018 CO 86, ¶ 6.

¶ 45    If supported by evidence, a defendant may assert self-induced intoxication as a defense to a specific-intent crime. *See People v. Vigil*, 127 P.3d 916, 930-31 (Colo. 2006). As a result, the defendant may offer evidence of intoxication "when it is relevant to negative the existence of a specific intent if such intent is an element of the crime charged." § 18-1-804(1), C.R.S. 2024.

¶ 46    "Intoxication" is defined by statute as "a disturbance of mental or physical capacities resulting from the introduction of any substance into the body." § 18-1-804(4). "Self-induced intoxication" means

intoxication caused by substances which the defendant knows or ought to know have the tendency to cause intoxication and which he knowingly introduced or allowed to be introduced into his body, unless they were introduced pursuant to medical advice or under circumstances that would afford a defense to a charge of crime.

§ 18-1-804(5).

## B.    Analysis

¶ 47    Without defining either "intoxication" or "self-induced intoxication," the district court provided the following jury instruction regarding Quinlan's intoxication defense:

> The evidence presented in this case has raised the question of self-induced intoxication with respect to the offenses of Murder in the First Degree, Tampering with a Deceased Human Body, and Tampering with Physical Evidence. For those offenses, you may consider whether or not evidence of self-induced intoxication negates the existence of the elements of "with intent" and "after deliberation and with intent."
>
> The prosecution has the burden of proving all the elements of the crimes charged beyond a reasonable doubt.  If you find the defendant was intoxicated to such a degree that he did not act with the required mental state, you should find him not guilty of that offense. However, you may not consider evidence of self-induced intoxication for purposes of deciding whether the prosecution has proved the elements of Murder in the Second Degree.

21

¶ 48    Even if we assume that the court erred by failing to define intoxication and self-induced intoxication, we discern no plain error that requires reversal. At trial, no one disputed that Quinlan was intoxicated. *See Lozano-Ruiz*, ¶ 6. Rather, the court's instruction and the prosecution's arguments zeroed in on the *degree* of Quinlan's intoxication and whether it prevented him from forming the requisite intent for the specific-intent charges he faced. The prosecutor acknowledged in closing argument, for example, that Quinlan had been drinking and using Xanax and marijuana, yet he argued that Quinlan wasn't "blackout drunk" or "too intoxicated to form the intent" to kill Brinson after deliberation.

¶ 49    Quinlan nevertheless argues that the statutory definitions of intoxication or self-induced intoxication required a less onerous showing than their common dictionary meanings. But even accepting that fact, Quinlan doesn't explain how, in light of the prosecution's acknowledgment that he was intoxicated, the statutory definitions would have helped the jury assess whether he formed the requisite intent. *See Lozano-Ruiz*, ¶ 5 ("[B]ecause the question of whether sexual penetration occurred was not contested at trial beyond the mere fact of the defendant pleading not guilty,

22

failure to include the definitional instruction did not rise to the level of plain error."); *see also People v. Walden*, 224 P.3d 369, 379-80 (Colo. App. 2009) (trial court's failure to provide the statutory definitions for "intoxication," "voluntary," and "involuntary" inured to the defendant's benefit and didn't rise to plain error).

¶ 50    Accordingly, the district court didn't plainly err by omitting the statutory definitions of intoxication and self-induced intoxication from the jury instructions.

## IV.    Mistrial Motions

¶ 51    Quinlan contends that the district court abused its discretion by denying his multiple motions for a mistrial, arguing that he suffered "cumulative prejudice" based on "three distinct incidents." He points to (1) courtroom outbursts by Brinson's mother; (2) a juror's pre-deliberation statements; and (3) midtrial delays caused by the COVID-19 pandemic.  We perceive no abuse of discretion.

## V.    Standard of Review and Applicable Law

¶ 52    A trial court enjoys broad discretion to grant or deny a mistrial, and we won't disturb its decision on appeal absent an abuse of discretion and prejudice to the defendant.  *People v. Salas*, 2017 COA 63, ¶ 9.  A mistrial is a drastic remedy and is warranted

only when the prejudice to the accused can't be remedied by other means. *Id.*

¶ 53     "Whether a mistrial is required following a witness's emotional outburst depends, in part, on whether the outburst was unexpected, the steps taken by the trial court to address the outburst, and how quickly those steps were undertaken." *People v. Owens*, 2024 CO 10, ¶ 126 (citing *People v. Ned*, 923 P.2d 271, 276 (Colo. App. 1996)).

## A.     Additional Background

¶ 54     At trial, Alberti testified that law enforcement found Brinson's head separate from the rest of his body.  Brinson's mother, who testified earlier in the trial, exclaimed from the audience, "Fucking asshole.  Fucking asshole.  You fucking asshole.  God.  Fucking asshole," before exiting the courtroom.  Defense counsel moved for a mistrial, which the court denied.  The court instructed the jury to disregard the outburst.  It also prohibited Brinson's mother from re-entering the courtroom, although it said she could observe the trial remotely over WebEx.

¶ 55     While watching over WebEx, Brinson's mother interrupted a second time near the end of trial when a girl scout troop entered the

24

courtroom.  She requested that the court "please get those children out of the courtroom."  The court immediately muted Brinson's mother and later expelled her from the Webex platform.  Defense counsel again moved for a mistrial, which the court denied.

¶ 56　　On the ninth day of trial, a defense investigator overheard a juror say to another juror, "Let's just get this done, huh?  I'm over it.  Whatever needs to be done, let's do it."  After the court interviewed both jurors, they agreed to continue listening to the evidence, determine the facts, and apply the law as provided by the court.  Both jurors also committed to giving the case the "time and attention" that it needed.  Defense counsel moved to strike the commenting juror and for a mistrial, both of which the court denied.

¶ 57　　Finally, the court twice adjourned the trial, resulting in a total delay of one week, after two jurors contracted COVID-19.  Before each adjournment, the court instructed the jurors not to (1) discuss the case with anyone; (2) research or investigate the case in any way; or (3) form or express any opinion about the case before deliberations began.  Defense counsel moved for a mistrial, but the court, again, denied the motion.

## B.     Analysis

¶ 58     Turning first to the outbursts by Brinson's mother, we discern no abuse of discretion in the court's decisions denying Quinlan's mistrial motions.  Applying *Owens* and *Ned*, we can't say that the outbursts were unexpected.  The jury would have reasonably expected Brinson's mother to express (1) anger upon hearing that law enforcement recovered Brinson's head separate from the rest of his body and (2) frustration that children might hear gruesome evidence regarding her son.  Moreover, the court instructed the jury to disregard the first outburst and barred Brinson's mother from being present in the courtroom.  When she interrupted again over WebEx, the court immediately muted her microphone and later expelled her from the proceeding altogether.  Quinlan doesn't challenge the timing of the court's curative measures.  On this record, we perceive no abuse of discretion in how the court handled the interruptions by Brinson's mother.  *See Owens*, ¶ 133.

¶ 59     We aren't persuaded otherwise by Quinlan's argument that *Harper v. People*, 817 P.2d 77 (Colo. 1991), provides the governing legal test.  *Harper* involved jurors' potential exposure to "extraneous information or influences" originating outside the courtroom.  *Id.* at

80. Unlike *Owens* and *Ned*, *Harper* doesn't apply to outbursts occurring in the courtroom. *See People v. Raehal*, 971 P.2d 256, 259 (Colo. App. 1998) (rejecting the argument that *Harper* applies to "prejudicial comments made in the courtroom").

¶ 60 Nor did the court abuse its discretion by denying Quinlan's motion for a mistrial based on one juror's midtrial comments to a second juror. Nothing in the juror's comments suggested that he had already formed an opinion regarding Quinlan's guilt. Moreover, after interviewing both jurors, the court found that they were committed to listening to all the evidence and deciding the facts based on the law without rushing the process. *See People v. Burnette*, 775 P.2d 583, 586 (Colo. 1989) (trial courts have "wide discretion" in deciding whether jurors have become unable to serve). The court also instructed the jury at the beginning of trial that it "must keep an open mind" throughout and reach a decision "only during your deliberations at the end of the trial." We presume the jury followed the court's instructions absent evidence to the contrary. *See People v. Quillen*, 2023 COA 22M, ¶ 40.

¶ 61 We also see no abuse of discretion in the court's decision adjourning trial for one week after two jurors contracted COVID-19.

27

After consulting with public health officials, the court found that adjourning the trial was necessary so that officials could deep clean the court facilities and jurors could be tested. The court also admonished the jury before each adjournment not to discuss the case, conduct any research or investigation, or form any opinions before deliberations began. Again, we presume jurors followed these instructions. *See id.*

¶ 62 Given these circumstances and brevity of the adjournments, we perceive no abuse of discretion in the court's decision denying Quinlan's request for the drastic remedy of a mistrial. *See Salas*, ¶ 9; *accord State v. Brown*, 996 N.W.2d 691, 701-02 (Iowa 2023) (nine-day delay midtrial due to the COVID-19 pandemic didn't require the court to declare a mistrial).

¶ 63 Because we conclude that the court didn't abuse its discretion by denying Quinlan's mistrial motions, we reject his argument that the cumulative effect of the court's alleged errors warrants reversal. *See People v. Rivers*, 727 P.2d 394, 401 (Colo. App. 1986) ("The doctrine of cumulative error requires that numerous errors be committed, not merely alleged.").

## VI.  Sentencing

¶ 64     Quinlan contends the district court erred by sentencing him to life in prison without the possibility of parole.  Emphasizing his relative youth (eighteen years old at the time of his offenses), Quinlan argues that this mandatory sentence is unconstitutional under both the Eighth Amendment to the United States Constitution and article II, section 20, of the Colorado Constitution.  We perceive no basis to reverse.

### A.  Eighth Amendment

¶ 65     The Eighth Amendment prohibits cruel and unusual punishments.  U.S. Const. amend. VIII.  Based on evolving standards of decency, the United States Supreme Court has ruled that certain sentences are unconstitutionally cruel and unusual when the defendant was a juvenile at the time of the offense.  *See Miller v. Alabama*, 567 U.S. 460, 479-80 (2012) (holding unconstitutional mandatory life in prison without the possibility of parole sentences for juvenile homicide offenders); *Graham v. Florida*, 560 U.S. 48, 74 (2010) (same for juvenile non-homicide offenders); *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (same for the death penalty for juveniles).

¶ 66 But in each case, including *Miller*, the Supreme Court limited its holding to those *under* eighteen at the time of the offense, recognizing that "a line must be drawn," and eighteen is "the point where society draws the line for many purposes between childhood and adulthood." *Roper*, 543 U.S. at 574; *accord Miller*, 567 U.S. at 465; *Graham*, 560 U.S. at 74-75. We are bound by the Supreme Court's interpretations of the Eighth Amendment. *See People v. Washington*, 2014 COA 41, ¶ 26; *see also People v. Ray*, 2025 CO 42, ¶¶ 174-75 (rejecting the argument that a nineteen-year-old defendant's sentence of life in prison without the possibility of parole violated the Eighth Amendment); *People v. Parks*, 987 N.W.2d 161, 172 (Mich. 2022) ("[W]e cannot contradict the Supreme Court if it has drawn a clear and unambiguous line under the United States Constitution between those under the age of 18 and those aged 18 and older.").

¶ 67 Accordingly, the district court didn't violate the Eighth Amendment by sentencing Quinlan to life in prison without the possibility of parole.

B.    Article II, Section 20, of the Colorado Constitution

¶ 68    For the first time on appeal, Quinlan relies on article II, section 20, of the Colorado Constitution to challenge the constitutionality of his sentence, arguing that it provides "more expansive" protection than the Eighth Amendment.  Because Quinlan didn't raise this argument before the district court, we can't address it.  *See McDonald v. People*, 2024 CO 75, ¶ 10 n.2.

VII.   Restitution

¶ 69    Quinlan also contends that the district court erred by entering an order for restitution beyond the statutory ninety-one-day deadline in section 18-1.3-603(1)(b), C.R.S. 2021 (version effective until Feb. 28, 2022),[2] without making an express finding of good cause to extend the deadline.  We conclude Quinlan waived this contention.

---

[2] Section 18-1.3-603, C.R.S. 2021 (version effective until Feb. 28, 2022), was in effect at the time of Quinlan's sentencing.  Since the statute has since been amended, *see* Ch. 307, secs. 1-2, § 18-1.3-603(1), (1)(b), (2)(a), 2025 Colo. Sess. Laws 1606-07, this opinion refers to the 2021 version throughout.

## A. Applicable Law and Standard of Review

¶ 70 With exceptions not pertinent here, section 18-1.3-603(1) provides that "[e]very order of conviction of a felony . . . shall include consideration of restitution." When a trial court determines that a defendant is obligated to pay restitution but doesn't determine the amount at sentencing, the court must order that the "the specific amount of restitution shall be determined within the ninety-one days immediately following the order of conviction, unless good cause is shown for extending the time period by which the restitution amount shall be determined." § 18-1.3-603(1)(b). In *People v. Weeks*, 2021 CO 75, ¶ 45, our supreme court held that the trial court "lack[s] authority" to order restitution beyond the ninety-one-day deadline unless it makes an express finding of good cause to extend the deadline before it expires.

¶ 71 But the ninety-one-day deadline isn't jurisdictional and "can be waived." *Babcock v. People*, 2025 CO 26, ¶ 27. Because the ninety-one-day deadline is a creature of statute, waiver must be voluntary but need not be knowing and intelligent. *People v. Roberson*, 2025 CO 30, ¶¶ 13-14. Waiver may be shown through explicit words or actions, or it may be implied when a party engages

32

in conduct that "manifests an intent to relinquish a right or privilege" or "acts inconsistently" with a right's assertion. *Id.* at ¶ 13 (citation omitted). "Waiver extinguishes error and therefore any appellate review." *Babcock,* ¶ 29.

¶ 72 We review de novo whether a party has waived a claim. *Richardson v. People*, 2020 CO 46, ¶ 21.

### B. Analysis

¶ 73 Before trial, the prosecution requested $7,760.78 in restitution for Brinson's burial expenses and therapy costs for his family. At Quinlan's sentencing on January 20, 2022, the district court reserved ruling on the restitution amount for ninety-one days after Quinlan requested additional time to review the prosecution's documentation. Defense counsel said, "[S]hould we seek a hearing, we would ask to proceed via notice to set." The court agreed and ordered counsel to work with its division clerk "to set a hearing should it come to pass that a hearing is needed." Defense counsel also demonstrated awareness of the ninety-one-day deadline during sentencing, saying it "appear[s] that the prosecution was seeking 91 days to perfect the restitution based on [its] pleading."

¶ 74    Five days after sentencing, the prosecution filed an amended restitution motion requesting an additional $1,080.  Quinlan objected on February 24, 2022, requesting that the court deny any restitution or, alternatively, "set a hearing to resolve" the issue.  The court scheduled a hearing for June 14, 2022 — 145 days after sentencing.  Notably, Quinlan never objected to the hearing taking place outside the ninety-one-day window.  At the end of the hearing, the court overruled Quinlan's objections and ordered restitution in the amount requested by the prosecution.

¶ 75    Like the defendants in *Roberson* and *Babcock*, Quinlan waived his statutory right to have the court determine the amount of restitution within ninety-one days.  Defense counsel was aware of the ninety-one-day deadline but nonetheless failed to object when the court scheduled the restitution hearing beyond the deadline in response to Quinlan's hearing request.  *See Roberson*, ¶ 17; *Finney v. People*, 2014 CO 38, ¶ 16 ("Counsel may waive a defendant's statutory rights.").  Nor did defense counsel mention the deadline during the restitution hearing.  *See Roberson*, ¶ 16 (defendant waived the ninety-one-day deadline by not objecting to the trial

court's suggestion that the parties hold a status conference after the deadline had expired).

¶ 76    Accordingly, Quinlan waived his statutory right to have the court determine the amount of restitution within ninety-one days after sentencing.

## VIII.  Disposition

¶ 77    We affirm the judgment.

JUDGE TOW and JUDGE YUN concur.