The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
November 9, 2023

## 2023COA105

**No. 21CA0886, *People v. Munoz-Diaz* — Constitutional Law — Fifth Amendment — Fourteenth Amendment — Due Process — Voluntariness of Statements**

A division of the court of appeals, applying established law to a novel fact pattern, concludes that a defendant's statements made to a police officer over the phone while the defendant was in Mexico were voluntary notwithstanding the officer's assurance that he was not going to Mexico to look for the defendant. In doing so, the division distinguishes our supreme court's recent decision in *People v. Smiley*, 2023 CO 36.

COLORADO COURT OF APPEALS                                    **2023COA105**

Court of Appeals No. 21CA0886
City and County of Broomfield District Court No. 15CR339
Honorable Sharon Holbrook, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Ricardo Enrique Munoz-Diaz,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE TOW
Furman and Berger*, JJ., concur

Prior Opinion Announced August 10, 2023, <u>WITHDRAWN</u>

Announced November 9, 2023

Philip J. Weiser, Attorney General, Frank R. Lawson, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Joseph T. Goodner, Alternate Defense Counsel, Englewood, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2023.

¶ 1     Defendant, Ricardo Enrique Munoz-Diaz, appeals his judgment of conviction entered on jury verdicts finding him guilty of felony murder, second degree murder, two counts of aggravated robbery, and two counts of burglary.  We affirm.

## I.     Background

¶ 2     Munoz-Diaz was suspected of killing his neighbor in her home, stealing her safe, selling her valuables, and then fleeing to Mexico.  A detective was able to reach Munoz-Diaz in Mexico by phone.[1]  During their recorded conversation, Munoz-Diaz admitted the homicide and the theft.  He was then extradited to Colorado and charged with first degree murder after deliberation and numerous other crimes.

¶ 3     Pretrial, Munoz-Diaz moved to suppress the statements he made during the phone call, arguing that his admissions were involuntary and thus inadmissible under the United States and Colorado Constitutions.  The district court denied the motion, and Munoz-Diaz's statements were presented to the jury.  Further, these statements led to the discovery of the victim's purse, which was

---

[1] The transcript of the phone call is a translation.  Most of the original conversation was in Spanish.

1

near a hardware store where Munoz-Diaz had purchased a dolly he allegedly used to move the victim's safe. The purse and surveillance footage of Munoz-Diaz purchasing the dolly were also presented to the jury.

¶ 4 Additionally, the People presented police testimony that four of the victim's watches had been sold to pawnshops under Munoz-Diaz's name. Munoz-Diaz's former roommate and coworker, Bernabe Mares, also testified that Munoz-Diaz looked "violent" and "scared" on the day of the murder. And finally, the prosecution presented DNA evidence linking Munoz-Diaz to the crime scene.

¶ 5 At trial, Munoz-Diaz did not dispute that he killed his neighbor in her home and took her safe; rather, he sought to negate the element of intent by proving that he was intoxicated. The jury acquitted Munoz-Diaz of first degree murder after deliberation but found him guilty of felony murder, second degree murder, and other crimes related to the theft.

## II. Voluntariness of Statements

¶ 6 Munoz-Diaz contends that his statements over the phone were involuntary under the Fifth and Fourteenth Amendments to the

2

United States Constitution and article II, sections 18 and 25 of the Colorado Constitution.  We disagree.

## A.    Additional Background

¶ 7    Early in the phone call, the detective said, "I'm not going to look for you in Mexico. . . .  I'm just telling you — you that you can't come back here, okay?  But I want you to please tell me what happened that day, and why."

¶ 8    When the detective asked about the killing, Munoz-Diaz first responded that he had found his neighbor's dead body when Mares had sent him to the victim's trailer to retrieve a safe.  However, after only a few pages of transcript, Munoz-Diaz admitted to the killing:

> DETECTIVE: Look, um, [Munoz-Diaz], I know that . . . you killed this girl.  And please . . . just tell me what — what happened that day because I know that [Mares] sent you.  And I . . . want to get [Mares] because he took advantage of — of you.  And . . . I want to know because the family needs to know why, what happened.  Okay?
>
> MUNOZ-DIAZ: Yes, I know that . . . .
>
> DETECTIVE: Just . . . think about the family, the children she left behind, this — this girl, and so this way God — God will forgive you.  But — but first you need, uh, to help me with this.
>
> MUNOZ-DIAZ: Yes, I accept that I did it.

3

¶ 9   Munoz-Diaz then recounted numerous details about the killing and consistently insisted that he was guilty.  The detective tried to garner favor with Munoz-Diaz by making statements like, "you're a good person and you made a mistake.  Okay?  But we want to find the people who are guilty for this" and "I know you're not a killer.  You didn't want to do this."  Munoz-Diaz consistently responded with statements like, "But I'm guilty" or "But, well, I did it."

¶ 10   Additionally, when the detective repeated that he was not interested in coming after Munoz-Diaz in Mexico, Munoz-Diaz consistently responded by saying that he was willing to pay for his acts.  This happened twice:

> DETECTIVE: Tell me who helped you.  I just want to talk to them — they — they didn't do what you did, but I need to speak to them.  Okay?  Just — just tell me the truth, okay, like I told you, I'm not going over there to look for you nor . . . .
>
> MUNOZ-DIAZ: No, in fact I'm willing to pay for my — for my acts. . . .
>
> DETECTIVE: But, um, but I swear that I don't — I don't — I'm not going to go looking for you over there in Mexico.  I am just, um, telling you that you can't come back here.  You understand me?  And if you come back here, you'll get arrested.

4

> MUNOZ-DIAZ: Uh-huh.  I know.  Hey and I'm willing to pay for my — my doings.

At one point, Munoz-Diaz even offered to return to Colorado, saying, "I want to clear this all up, if it's even possible I'd go back there.  It's no problem . . . .  To pay for my fault."

¶ 11    The phone call ended with planning a future conversation, the detective thanking Munoz-Diaz, and Munoz-Diaz saying, "Don't mention it[,] and I'm willing to cooperate."

## B.    Standard of Review

¶ 12    "A trial court's suppression ruling presents a mixed question of fact and law." *People v. Ramadon*, 2013 CO 68, ¶ 21.  We defer to the district court's findings of historical fact if they are supported by the record, but we review de novo the legal effect of the facts.  *Id.* Further, "[w]hen the interrogation is audio or video-recorded, and there are no disputed facts outside the recording pertinent to the suppression issue, we are in the same position as the trial court in determining whether the statements should or should not be suppressed under the totality of the circumstances."  *Id.*

## C. Analysis

¶ 13    "Under the due process clauses of the United States and Colorado constitutions, a defendant's statements must be voluntary to be admissible as evidence." *Id.* at ¶ 18.  It is the People's burden to show, by a preponderance of the evidence, that a defendant's statements were voluntary.  *People v. Bryant*, 2018 COA 53, ¶ 20.

¶ 14    In determining whether a statement was voluntary, courts consider the totality of the circumstances and focus on whether the officer's behavior overcame the defendant's will and brought about an inculpatory statement that was not "freely self-determined." *Ramadon*, ¶ 20.  Analyzing whether a statement was voluntary is a two-step inquiry, asking (1) whether the official conduct was coercive and (2) whether the coercive conduct "played a significant role in inducing the statements." *Id.*  Both steps of this inquiry consider a wide range of nonexhaustive factors:

> 1. whether the defendant was in custody;
>
> 2. whether the defendant was free to leave;
>
> 3. whether the defendant was aware of the situation;
>
> 4. whether the police read *Miranda* rights to the defendant;

6

5. whether the defendant understood and waived *Miranda* rights;

6. whether the defendant had an opportunity to confer with counsel or anyone else prior to or during the interrogation;

7. whether the statement was made during the interrogation or volunteered later;

8. whether the police threatened [the] defendant or promised anything directly or impliedly;

9. the method [or style] of the interrogation;

10. the defendant's mental and physical condition just prior to the interrogation;

11. the length of the interrogation;

12. the location of the interrogation; and

13. the physical conditions of the location where the interrogation occurred.

*Cardman v. People*, 2019 CO 73, ¶ 23 (quoting *People in Interest of Z.T.T.*, 2017 CO 48, ¶ 13).

¶ 15    The factors that weigh towards a holding of voluntariness are that Munoz-Diaz was not in custody during the phone call (factor 1); he was free to hang up and leave (factor 2); nothing prevented him from consulting with counsel before or during the telephone call (factor 6); Munoz-Diaz was in good physical condition

7

and, although he said he was "tormented," his mental condition was good enough to be alert and responsive (factor 10); and the conversation occurred while Munoz-Diaz was at work and there is no evidence that his working conditions were poor (factors 12 and 13).

¶ 16 Conversely, the factors that weigh towards involuntariness are that Munoz-Diaz was neither advised of nor did he waive his *Miranda* rights (factors 4 and 5); the police promised that they would not come after him in Mexico (factor 8); and the phone conversation was, as the trial court found, "lengthy" (factor 11).

¶ 17 There were also multiple factors that went both ways given the unique circumstances of this phone call. While Munoz-Diaz was arguably unaware (based on the detective's promises) that the conversation could lead to extradition, he was told from the outset that the detective wanted to talk about the killing (factor 3). Munoz-Diaz's admission was also made during the phone call; however, in the middle of the conversation the call was dropped and Munoz-Diaz answered the phone when the detective called back (factor 7). Finally, to the extent Munoz-Diaz interpreted the detective's statement as a promise, the fact that a phone call was

the method used lent credibility to the detective's representation that the police would not come after Munoz-Diaz in Mexico, but also made it easier for Munoz-Diaz to disengage and feel unthreatened (factor 9).

¶ 18    While the factors here are roughly split, we do not simply count the factors on each side; rather, we accord weight depending on the circumstances involved. *Id.* at ¶ 27.

¶ 19    We first acknowledge that some of the detective's questioning was arguably coercive. At the outset of the phone call, the detective told Munoz-Diaz that, while Munoz-Diaz could not go back to Colorado without being arrested, the detective was not "going to look for [Munoz-Diaz] in Mexico." This concept was repeated two more times throughout the conversation, and accordingly, the district court found that the detective promised Munoz-Diaz that he would not be extradited and that this promise was not followed. These purported promises "to avoid punishment or hardship" may have risen "to the level of coercion." *People v. Springsted*, 2016 COA 188, ¶ 35.

¶ 20    But, as noted, whether the police conduct was coercive is only half the inquiry. We must still determine if Munoz-Diaz's

9

statements were "*obtained by* any direct or implied promises." *People v. Medina*, 25 P.3d 1216, 1223 (Colo. 2001) (emphasis added) (quoting *People v. Gennings*, 808 P.2d 839, 843 (Colo. 1991)).[2] We thus must consider whether the detective's actions here played a significant role in inducing Munoz-Diaz's statements. In other words, the detective's promises not to come after Munoz-Diaz in Mexico must have overcome Munoz-Diaz's will. *See Ramadon*, ¶ 20. We conclude that they did not.

¶ 21 Rather than expressing any concern of extradition or arrest, Munoz-Diaz consistently assured the detective that he was "willing to pay for [his] acts," even in response to the detective's promises not to come after him Mexico.[3] In fact, even though the detective said Munoz-Diaz could not return to Colorado without being

---

[2] In light of this requirement, we reject the People's argument that there can only be an involuntary statement based on a promise if the police, quid pro quo, promise a lack of punishment in exchange for a confession. The People's interpretation would effectively require all coercive promises to be express and clearly lay out the exchange as if it were consideration in a contract. But implied promises, "however slight," may result in involuntary confessions. *People v. Medina*, 25 P.3d 1216, 1223 (Colo. 2001) (quoting *People v. Gennings*, 808 P.2d 839, 843 (Colo. 1991)).

[3] Munoz-Diaz responded that he was "willing to pay" for his actions two out of the three times that the detective promised not to come after him in Mexico.

arrested, Munoz-Diaz said, "I want to clear this all up, if it's even possible I'd go back there. It's no problem . . . . To pay for my fault."

¶ 22 This case is thus unlike *Cardman*, ¶ 5, where the defendant responded to the detective's promise that the case would "go away" with "I would love that" — thus clearly expressing a desire to not get in legal trouble. To the contrary, Munoz-Diaz expressly repeated that he was "willing to pay for [his] acts," indicating that he made his statements despite the possible consequences of extradition and arrest.

¶ 23 While this case was pending, the Colorado Supreme Court decided *People v. Smiley*, 2023 CO 36, which Munoz-Diaz asks us to consider as supplemental authority. That case, however, dealt not with the voluntariness of statements but, rather, with the voluntariness of a waiver of the right to remain silent. As the supreme court noted, "While these two forms of voluntariness are factually related, they are 'analytically distinct.'" *Id.* at ¶ 18 (quoting *People v. Jiminez*, 863 P.2d 981, 984 n.3 (Colo. 1993)). Thus, we believe *Smiley* has little, if any, bearing on this case.

11

¶ 24    And even acknowledging that the analytical principles of the involuntariness analysis involving a waiver of the right to remain silent overlap with the analytical principles involving the voluntariness of a defendant's statements, *Smiley* still provides Munoz-Diaz no assistance.  In *Smiley*, the police affirmatively misled a homeless teenager in their custody.  *Id.* at ¶ 44.  No similar facts exist here, where Munoz-Diaz was not in custody, re-initiated the contact on his own, and was not affirmatively lied to by the police.

¶ 25    Additionally, we disagree that the detective's other actions rendered Munoz-Diaz's statements involuntary.  First, the detective's appeals to Munoz-Diaz's religion and to the family's need for closure did not rise to police coercion, instead implicating only "moral and psychological pressures to confess emanating from sources other than official coercion." *Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1986)) (holding that detective's question, "Do you pray to God to forgive you for shooting that boy down?" did not render the defendant's statement involuntary); *see also People v. Theander*, 2013 CO 15, ¶ 44 (concluding that "it was not coercive for police to

indicate . . . that [the defendant's] children would want to know that [the defendant] had helped find their father's killer").

¶ 26      And, although the detective indicated the police were interested in alternate suspects, including Mares, Munoz-Diaz consistently responded by saying, "But I'm guilty." First, "[p]loys to mislead a suspect or lull him into a false sense of security" do not necessarily "rise to the level of compulsion or coercion." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). And even if the detective's suggestion that there was an alternate suspect qualified as coercive police conduct, we cannot say Munoz-Diaz's statements were induced by these misleading statements because he consistently — and willingly — affirmed his own guilt in response.

¶ 27      We thus agree with the district court that the prosecution showed, by a preponderance of the evidence, that Munoz-Diaz's statements were not brought about by coercive police conduct but rather were the product of his willingness — even desire — to "pay for his acts" and to "clear this all up." In other words, his statements were freely self-determined and voluntary. *See Ramadon*, ¶ 20. The district court's denial of Munoz-Diaz's motion to suppress, therefore, was not error.

### III. DNA Evidence

¶ 28     Munoz-Diaz next contends the district court reversibly erred by admitting DNA swabs into evidence without adequate foundation. Munoz-Diaz also argues, for the first time on appeal, that this introduction of unauthenticated evidence violated his rights to an impartial jury, to due process, and to confront the witnesses against him. Again, we disagree.

¶ 29     Even assuming that the district court abused its discretion by admitting the DNA swabs, which linked Munoz-Diaz to the scene of the crime, there was overwhelming independent evidence of Munoz-Diaz's guilt. *See Pernell v. People*, 2018 CO 13, ¶¶ 25-27 (concluding error was harmless when there was overwhelming independent evidence of defendant's guilt); *see also People v. Clark*, 2015 COA 44, ¶ 14 (reviewing evidentiary rulings for abuse of discretion). As noted, Munoz-Diaz admitted to the killing, his statements led to the discovery of the victim's purse, and surveillance footage showed Munoz-Diaz buying a dolly to move the safe. Further, police found that the victim's stolen watches had been pawned in Munoz-Diaz's name. Moreover, at trial, Munoz-Diaz did not dispute that he was at the crime scene or committed

14

the killing, arguing only that he did not form the requisite intent for first degree murder after deliberation. (And the jury accepted that argument.) The admission of DNA evidence linking Munoz-Diaz to the crime scene was thus harmless given Munoz-Diaz's defense and the overwhelming amount of independent evidence indicating he was guilty.

¶ 30    As for Munoz-Diaz's unpreserved constitutional arguments, for similar reasons, we do not believe the admission of the DNA evidence "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos v. People*, 2012 CO 63, ¶ 14 (quoting *People v. Miller*, 113 P.3d 743, 748-50 (Colo. 2005)) (holding that, under plain error review, "the error must impair the reliability of the judgment of conviction to a greater degree than under harmless error to warrant reversal").

IV.    Disposition

¶ 31    The judgment of conviction is affirmed.

JUDGE FURMAN and JUDGE BERGER concur.