23CA1573 Peo v Martinez 06-04-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1573
El Paso County District Court No. 21CR7154
Honorable David A. Gilbert, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Paul Martinez,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE LIPINSKY
Welling and Tow, JJ. concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 4, 2026

---

Philip J. Weiser, Attorney General, Majid Yazdi, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, John P. Finnegan, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Paul Martinez appeals his convictions for possession with intent to manufacture or distribute a controlled substance and unlawful possession of a controlled substance.  He contends that the trial court erred by (1) admitting evidence that individuals were seen entering and leaving his apartment nine days before detectives found drugs there during a search; (2) admitting insufficiently authenticated drug evidence; (3) allowing the prosecutor to use an improper reasonable doubt analogy during voir dire; (4) admitting a detective's opinion testimony that Martinez possessed methamphetamine with intent to distribute; and (5) imposing a sentence in the aggravated range in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004).  We affirm.

## I.     Background

¶ 2     While surveilling Martinez's apartment on November 29, 2021, Detective Erik Gulbrandson saw, within a forty-five-minute period, three people knock on Martinez's door, be let in, and leave after five minutes or less.  (Detective Gulbrandson later acknowledged that one of the three individuals was Martinez's roommate.)

¶ 3     On December 8, 2021, while conducting additional surveillance on the apartment, Detective Gulbrandson observed Martinez throw a trash bag into a community bin.  Detective Gulbrandson collected the bag and found what he "considered to be drug paraphernalia" inside it.  He obtained a search warrant for Martinez's apartment based on the bag's contents.

¶ 4     Detective Gulbrandson and four other detectives executed the search warrant on December 15, 2021.  They recovered from the apartment methamphetamine, heroin, packaging material, digital scales, and a vacuum-sealed bag (which Detective Gulbrandson later explained is commonly used to transport drugs).

¶ 5     Martinez was charged with possession with intent to manufacture or distribute a controlled substance (methamphetamine) and unlawful possession of a controlled substance (heroin) from December 8 to December 15, 2021.  Martinez admitted that he used methamphetamine and heroin, but he asserted that he solely possessed the drugs for personal use.

¶ 6     A jury convicted Martinez of both counts, and the trial court sentenced him to eight years in the custody of the Department of

Corrections (DOC) for possession with intent to distribute and time served for possession of a controlled substance.

## II. Analysis

### A. Martinez's Evidentiary Contentions

#### 1. Standard of Review

¶ 7 "We review a trial court's evidentiary rulings for an abuse of discretion." *People v. Cross*, 2023 COA 24, ¶ 9, 531 P.3d 444, 447 (quoting *Rojas v. People*, 2022 CO 8, ¶ 16, 504 P.3d 296, 302). "A trial court abuses its discretion if it misconstrues or misapplies the law or otherwise reaches a manifestly arbitrary, unreasonable, or unfair result." *People v. Johnson*, 2019 COA 159, ¶ 10, 487 P.3d 1166, 1171, *aff'd*, 2021 CO 35, 486 P.3d 1154.

¶ 8 When a defendant timely objects to the admission of evidence that does not "specifically and directly offend [his] constitutional rights," *Wend v. People*, 235 P.3d 1089, 1097 (Colo. 2010), as here, "any error that occurred in the admission of this evidence is subject to non-constitutional harmless error review." *Pernell v. People*, 2018 CO 13, ¶ 22, 411 P.3d 669, 673. Under this standard, "an objected-to trial error is harmless if there is no reasonable possibility that it contributed to the defendant's conviction." *Id.*

3

The People bear the burden of proving that "the error did not substantially influence the verdict or affect the fairness of the trial proceedings." *James v. People*, 2018 CO 72, ¶ 19, 426 P.3d 336, 341.

### 2. The November 29 Surveillance Evidence

¶ 9 Martinez contends that the trial court erred by admitting as intrinsic evidence Detective Gulbrandson's testimony about the three individuals who briefly visited Martinez's apartment on November 29 (the November 29 surveillance evidence) — nine days before the time period specified in the complaint and information (the complaint). Martinez argues that, because the November 29 surveillance evidence was extrinsic, the trial court should have evaluated it under CRE 404(b) and *People v. Spoto*, 795 P.2d 1314 (Colo. 1990), and, if it admitted the evidence, given the defense an opportunity to request a limiting instruction. We conclude that, although the trial court abused its discretion by determining that the November 29 surveillance evidence was intrinsic and admitting it without allowing the defense to ask for a limiting instruction, the error was harmless.

¶ 10    "Unless otherwise provided by constitution, statute, or rule, all relevant evidence is admissible." *Spoto*, 795 P.2d at 1318; *see* CRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." CRE 401.

¶ 11    But not all relevant evidence is admissible. For example, "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." CRE 404(b)(1).

¶ 12    We begin by considering whether the November 29 surveillance evidence is evidence of Martinez's "other" acts. *See Rojas*, ¶ 42, 504 P.3d at 308 (CRE 404(b) "requires trial courts to evaluate, in the first instance, when 'other' crimes, wrongs, or acts are at issue"). The November 29 surveillance evidence falls into this category because it occurred outside the time period specified in the complaint. *See People v. Sauser*, 2020 COA 174, ¶ 46, 490 P.3d 1018, 1029 (holding that other act evidence is evidence that

"'involves a separate and distinct episode wholly independent from the offense charged,' even if it is 'similar in nature' to the charged offense" (quoting *People v. Trujillo*, 2014 COA 72, ¶ 69, 338 P.3d 1039, 1051)).

¶ 13    In *People v. Vasquez*, the division explained that, "[f]or other acts evidence to be admissible," the trial court "must first determine, by a preponderance of the evidence, that the other act happened and that the defendant committed the act." 2022 COA 100, ¶ 74, 521 P.3d 1042, 1056. Although Detective Gulbrandson did not testify that he saw Martinez selling drugs on November 29, the November 29 surveillance evidence suggested that Martinez was meeting with drug buyers in the apartment on that date. Indeed, the evidence had no probative value beyond this inference — that Martinez had a bad character and did the types of things a drug dealer would do.

¶ 14    Because the November 29 surveillance evidence is evidence of Martinez's "other" acts, we next examine whether it is intrinsic or extrinsic to the charged offense. "Intrinsic acts are those (1) that directly prove the charged offense or (2) that occurred contemporaneously with the charged offense and facilitated the

commission of it.*" *Rojas*, ¶ 52, 504 P.3d at 309. "Evidence of acts that are intrinsic to the charged offense are exempt from Rule 404(b) because they are not 'other' crimes, wrongs, or acts. Accordingly, courts should evaluate the admissibility of intrinsic evidence under Rules 401-403." *Id.*

¶ 15 In contrast, evidence of other crimes, wrongs, or acts that do not directly prove the charged offense is extrinsic. *See id.* Extrinsic evidence that "suggests bad character (and thus a propensity to commit the charged offense) . . . is admissible only as provided by Rule 404(b) and after a *Spoto* analysis." *Id.* If extrinsic evidence does *not* suggest bad character, it too falls outside CRE 404(b)'s scope, and its admissibility is evaluated under CRE 401 to 403. *Id.*

### b. Additional Facts

¶ 16 Before opening statements, and outside the presence of the jury, defense counsel asked whether the prosecution intended to introduce the November 29 surveillance evidence even though the parties had previously agreed "there was . . . no [CRE] 404(b)" evidence. The prosecutor explained that she intended to "get into the fact that there was surveillance done. There was traffic consistent with drug sales at that location, and that's why [the

7

police] launched the investigation." The trial court said to the prosecutor,

> [I]t does not sound to me like you're alleging that [the November 29] evidence of people coming and going is some sort of separate incident of bad behavior. . . . [Y]ou're trying to say that this is part and parcel of what you believe is going on in the household in terms of selling or sharing narcotics?

¶ 17 The prosecutor responded in the affirmative, adding that the November 29 surveillance evidence "would be intrinsic to . . . the case at hand."

¶ 18 The prosecutor argued that she intended to introduce evidence of Martinez's presence at the apartment on November 29 and the three individuals' brief visits to it on the same day "to prove [Martinez's] connection to the location" and that a "business [was] happening" there. The defense countered that the "information [from] November 29" was "separate" from the information gleaned during the December 8 surveillance and that the November 29 surveillance evidence was "not in the date and timeframe" of the charges. Defense counsel further argued that the November 29 surveillance evidence was inadmissible extrinsic evidence because Martinez was charged with "possession with intent to distribute

8

between December 8th and December 15th, not . . . on November 29th."

¶ 19 The trial court ruled that the November 29 surveillance evidence was admissible intrinsic evidence because it "[bore] relevance in terms of whether or not it makes it more or less likely that a week later and then for the ensuing days of this claim there was dealing happening." The trial court further said that, "[e]ven though it falls outside the date range it is not, in my opinion, claims of other act evidence."

### c. The Trial Court Erred by Admitting the November 29 Surveillance Evidence Without a Limiting Instruction

¶ 20 Martinez argues that the trial court abused its discretion by finding that the November 29 surveillance evidence was intrinsic and by admitting it without granting defense counsel an opportunity to request a limiting instruction. We agree.

¶ 21 We conclude that the trial court abused its discretion by admitting the November 29 surveillance evidence as intrinsic. The surveillance that Detective Gulbrandson conducted on that date did not occur contemporaneously with the charged offenses, and the three individuals' brief visits to the apartment did not facilitate the

9

commission of crimes during the time period specified in the complaint. *See Rojas*, ¶ 52, 504 P.3d at 309. Under *Rojas*, the November 29 surveillance evidence would have been intrinsic if the complaint had referenced November 29 to December 15, rather than December 8 to December 15. *See id.* at ¶ 54, 504 P.3d at 310 (concluding that the defendant's conduct that occurred outside the time period when the charged counts occurred was not contemporaneous).

¶ 22    Accordingly, the November 29 surveillance evidence did not directly establish that Martinez sold drugs between December 8 and December 15, and such evidence therefore was not intrinsic. *See id.* And the identities of the individuals who briefly visited Martinez's apartment on November 29 were irrelevant to the charges. Instead, the prosecution sought to use the evidence that Martinez received these short-term visitors to convince the jury that, because Martinez sold drugs from the apartment on November 29, he had a bad character as a drug dealer — and thus had a propensity to commit the charged offenses between December 8 and 15.

¶ 23     In concluding that the November 29 surveillance evidence was intrinsic, the trial court found it was direct evidence of "what was going on in the [apartment] in the next week after the [December 8] search of [Martinez's] trash." According to the trial court, the evidence was "part and parcel of what [the prosecution] believe[s] [was] going on in the household in terms of selling or sharing narcotics." Thus, the trial court admitted the evidence to establish that between December 8 and December 15 — the times specified in the complaint — Martinez distributed a controlled substance based on his propensity to engage in such conduct.

¶ 24     Even though CRE 404(b) prohibits the admission of propensity evidence, the trial court agreed with the prosecution that the November 29 surveillance evidence was admissible for this very purpose. During their opening statements and closing arguments, the prosecutors characterized the visits to Martinez's apartment on that day as "very consistent with drug sales" and "indicat[ed] that [Martinez] was selling." The prosecutors told the jury that, for this reason, the November 29 surveillance evidence supported convictions for the charged offenses.

¶ 25     During the trial, the prosecution elicited testimony from Detective Gulbrandson to support its argument that Martinez had a propensity to sell drugs from the apartment.  Detective Gulbrandson said he "look[s] for" behavior such as persons making brief visits to a suspect's home while investigating the person for drug sales and that Martinez had engaged in such behavior on November 29.

¶ 26     For these reasons, we agree with Martinez that the trial court should have categorized the November 29 surveillance evidence as extrinsic character evidence and, therefore, should have analyzed its admissibility through the lens of CRE 404(b) and *Spoto, see Rojas*, ¶ 52, 504 P.3d at 309, and allowed defense counsel to request a limiting instruction if the court deemed the evidence admissible, *see id.* at ¶ 33, 504 P.3d at 306.

¶ 27     We need not consider whether the evidence was admissible under CRE 404(b) and *Spoto*, however, because, even if it was admissible, the trial court did not afford defense counsel the opportunity to request a limiting instruction.  *See id.* at ¶ 54, 504 P.3d at 310.  Because we conclude that the court erred by not allowing defense counsel to argue for a limiting instruction when

the court admitted the November 29 surveillance evidence, we next turn to whether the error was harmless.

### d. Admitting the November 29 Surveillance Evidence Without a Limiting Instruction Was Harmless Error

¶ 28    As noted, the People must demonstrate there is "no reasonable possibility" that the admission of the November 29 surveillance evidence contributed to Martinez's conviction. *Pernell*, ¶ 22, 411 P.3d at 673. One way of doing so is to show there is "overwhelming independent evidence of [the defendant's] guilt." *People v. Munoz-Diaz*, 2023 COA 105, ¶ 29, 543 P.3d 402, 408. As the People note, the prosecution only minimally relied on the November 29 surveillance evidence at trial. Other evidence overwhelmingly demonstrated Martinez's intent to distribute narcotics during the relevant time period — for example, on December 15, officers found that his apartment contained an amount of methamphetamine that exceeded what a normal user would possess, packaging material, digital scales, and vacuum-sealed bags. Moreover, Martinez's statements to police and Detective Gulbrandsen's expert testimony also supported the verdict, *infra* Part II.A.3.a. Accordingly, we are persuaded that there is not a reasonable probability that the

November 29 surveillance evidence contributed to Martinez's conviction, and its admission was harmless.

### 3. Detective Gulbrandson's Expert Testimony

¶ 29    Martinez next contends that the trial court erred by allowing Detective Gulbrandson to provide opinion testimony that the drugs found in Martinez's apartment were for distribution rather than personal use.  We disagree.

### a. Additional Facts

¶ 30    During opening statements, the prosecution informed the jury that Detective Gulbrandson would "explain . . . why the evidence he collected with other detectives . . . shows that there's distribution."  The prosecution moved, without objection, for Detective Gulbrandson's qualification as an expert on distribution of narcotics.  The trial court qualified him to render opinions on that subject.

¶ 31    The prosecutor questioned Detective Gulbrandson about "what sorts of things" he looks for when investigating individuals for drug dealing.  Detective Gulbrandson testified that he does "a lot of surveillance" and "generally . . . look[s] for people coming to a place . . . for five minutes at a time and leav[ing] throughout the

14

day."  He said he observed this type of activity at Martinez's apartment on November 29.  *See supra* Part II.A.2.b.

¶ 32     Detective Gulbrandson then testified about the drug paraphernalia he recovered from Martinez's trash bag on December 8.  *See supra* Part II.A.2.b.  He opined that "it was what [he] would consider to be packaging material and material used to ingest narcotics."  He noted that he obtained the search warrant for Martinez's apartment based on his belief that the contents of the trash bag were "evidence of drug trafficking."

¶ 33     Detective Gulbrandson itemized the evidence he found in the trash bag and in Martinez's apartment and explained how that evidence tended to show that Martinez was distributing drugs:

- "Vacuum-sealed bags are used to transport and conceal large quantities of narcotics usually."

- "Lots of packages with large quantities will be in [plastic bags], cling wrapped in [cellophane cling wrap], eventually put in [a] vacuum-sealed bag."

- He characterized the plastic bags and scale found in Martinez's apartment as "packaging materials that a drug dealer would have."

- "[T]iny bags with a Ziploc top, [are] very commonly used to store, dispense, sell small amounts of narcotics."

¶ 34    The prosecutor asked Detective Gulbrandson, "[B]ased on your training and experience, why did you ultimately request that [Martinez] be arrested on these charges?"  Detective Gulbrandson replied, "Because there was evidence of drug distribution in his apartment . . . ."  The prosecutor asked, "[W]hat kinds of things specifically" led him to "believe that this was distribution of narcotics?"  Detective Gulbrandson reiterated that the packaging material and scales were "specifically" used to transport large amounts of drugs and that the quantity of drugs in Martinez's apartment — thirty-four grams of methamphetamine — was more than what a "general abuser would[] normally" have.

¶ 35    Detective Gulbrandson then testified that, following Martinez's arrest, Martinez said he "get[s] high for free."  Detective Gulbrandson explained that "people who use drugs and sell a little bit of drugs, basically say they're using drugs for free . . . .  [D]rug users[] [will] consume some of their product.  They sell the rest of it for a little bit more to pay for what they consume."

¶ 36    Toward the end of Detective Gulbrandson's direct examination, the prosecutor asked him, "[W]hen you look at all of these things together and as well as your conversation with Mr. Martinez, why was it your opinion that it was distribution rather than personal use?"  Defense counsel objected, but the trial court overruled the objection, finding that Detective Gulbrandson had "already discussed some of the features in question" and that the question properly elicited "a summary of what factors the detective thought were important to the issue of distribution versus personal use."  Detective Gulbrandson responded that "[t]here were several factors" and reviewed the indicia of distribution found in Martinez's apartment.  Detective Gulbrandson added, "Martinez said he was a user of methamphetamine.  A meth user will always have a glass pipe . . . .  [I]t's by far the most common way to consume [meth] . . . and we didn't find a pipe there."

¶ 37    On cross-examination, Detective Gulbrandson testified that Martinez could have ingested drugs without a glass pipe, there were indicia of drug use in his apartment, the amount of drugs in the apartment was enough for "10 to 15 days" for a "heavy user," Detective Gulbrandson never asked Martinez how much he

17

consumed, and the drugs in the apartment were not packaged for sale.

¶ 38     The trial court instructed the jurors that they were "not bound by the testimony of a witness who has testified as an expert" and they may "believe all of an expert witness's testimony, part of it, or none of it.  The weight you give the testimony is entirely [the jury's] decision."

b.     The Trial Court Did Not Err by
Allowing Detective Gulbrandson
to Offer an Opinion on Drug Distribution

¶ 39     "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  CRE 704.  An expert witness, however, cannot "tell the jury what result to reach or form conclusions for the jurors that they are competent to reach on their own."  *People v. Baker*, 2019 COA 165, ¶ 14, 487 P.3d 1194, 1199, *aff'd*, 2021 CO 29, 485 P.3d 1100.  Such testimony is inadmissible "when the expert . . . applied the law to the facts in such a way as to suggest that the expert had determined that the defendant was guilty."  *Baker*, 2021 CO 29, ¶ 33, 485 P.3d at 1107.

¶ 40 To determine whether expert testimony usurps the jury's function, we examine, among other considerations, whether

(1) the expert usurped the function of the jury by expressing an opinion on the applicable law or legal standards;

(2) the expert opined that the defendant had committed the crime or there was a particular likelihood that the defendant did so;

(3) the expert clarified the testimony on cross-examination; and

(4) the trial court properly instructed the jury on the law and told the jury it could accept or reject the expert's opinion.

*Id.* at ¶ 32, 485 P.3d at 1106-07.

¶ 41 We consider each factor in turn.

¶ 42 First, Detective Gulbrandson did not usurp the jury's function by expressing an opinion on the applicable law or legal standards. The prosecutor repeatedly prompted Detective Gulbrandson to discuss what "sorts" or "kinds" of "things" he would look for while investigating whether a suspect was "dealing." Detective Gulbrandson pointed to the specific evidence he found in Martinez's

apartment that he "consider[ed]" or "believed" to be evidence of drug trafficking.

¶ 43 Second, Detective Gulbrandson did not opine that Martinez committed either charged offense or there was a particular likelihood that Martinez did so. Detective Gulbrandson's testimony that Martinez was arrested because of the "evidence of drug distribution" did not cross this line. Nor did Detective Gulbrandson offer an improper opinion in response to the prosecutor's request to explain why he believed that "it was distribution rather than personal use." Although Detective Gulbrandson did not disavow the prosecutor's characterization of his opinion, he again referred to the things he would look for as part of a drug dealing investigation. He said that he found in Martinez's apartment items that a drug dealer "would" have, "could" be used for dealing, and were "not consistent" with personal use. At no point did Detective Gulbrandson expressly say that Martinez was a drug dealer.

¶ 44 Thus, contrary to Martinez's argument, Detective Gulbrandson's opinion testimony did not go beyond characterizing and commenting on the evidence or apply facts to the law to suggest Martinez was guilty. Unlike the expert witness in *Baker*,

who referred to disputed facts as true and told the jury the facts were material, *id.* at ¶ 14, 485 P.3d at 1104, Detective Gulbrandson relied on his expertise in narcotics to explain the evidence he "consider[ed]" and "believed" to form an opinion that Martinez was not just consuming drugs for personal use but was also selling them.

¶ 45　　Third, defense counsel had a full opportunity to clarify Detective Gulbrandson's testimony. On cross-examination, defense counsel directed Detective Gulbrandson's attention to evidence suggesting that Martinez only possessed the drugs for personal use.

¶ 46　　Fourth, the trial court properly instructed the jury that it was "not bound" by Detective Gulbrandson's testimony and could choose to believe "none of it." It was within the province of the jury to decide which portions, if any, of Detective Gulbrandson's testimony were credible. *See People v. Newell*, 2017 COA 27, ¶ 28, 395 P.3d 1203, 1208.

¶ 47　　Moreover, unlike the expert witness in *Baker*, all of Detective Gulbrandson's opinions were based on information shared with the jury — the indicia of drug dealing about which he testified and a video of his interview with Martinez were admitted into evidence.

21

And Detective Gulbrandson did not "imply[] that [he] knew more about the facts than [the jury] did." *Baker*, 2019 COA 165, ¶ 22, 487 P.3d at 1201.

¶ 48   In sum, the trial court did not abuse its discretion by admitting Detective Gulbrandson's expert testimony.

### 4.   Authentication of the Drug Evidence

¶ 49   Martinez contends that the trial court erred by admitting the evidence of the drugs found in his apartment because the prosecution failed to sufficiently account for it "at all times" to authenticate it. The People counter that Martinez waived this argument because he conceded that he possessed the drugs and did not contemporaneously object to the evidence's admission. We agree with the People.

### a.   Applicable Law

¶ 50   When the defense fails to object to the admission of evidence, we only reverse if the trial court abused its discretion by admitting the evidence and such abuse rose to the level of plain error. *People v. Allgier*, 2018 COA 122, ¶ 30, 428 P.3d 713, 720-21. The right to have evidence excluded is a nonfundamental right that defense

counsel may waive. *See Phillips v. People*, 2019 CO 72, ¶ 16, 443 P.3d 1016, 1022.

¶ 51    "Waiver . . . is 'the *intentional* relinquishment of a *known* right or privilege.'" *People v. Rediger*, 2018 CO 32, ¶ 39, 416 P.3d 893, 902 (quoting *Dep't of Health v. Donahue*, 690 P.2d 243, 247 (Colo. 1984)). "We 'do not presume acquiescence in the loss of fundamental constitutional rights, and therefore indulge every reasonable presumption against waiver.'" *Id.* (quoting *People v. Curtis*, 681 P.2d 504, 514 (Colo. 1984)). "[W]aiver extinguishes error, and therefore appellate review . . . ." *Id.* at ¶ 40, 416 P.3d at 902. Evidence that a party intended to relinquish a right may be express or implied. *See id.* at ¶ 42, 416 P.3d at 902.

### b.    Martinez Waived His Challenge to the Drug Evidence's Authenticity

¶ 52    Police seized the following drugs from Martinez's apartment:

- methamphetamine in a bag from the inside of a nightstand drawer;

- methamphetamine loose on top of a dresser; and

- suspected heroin on top of a nightstand.

¶ 53    The prosecution admitted evidence of these drugs through Detective Gulbrandson, who testified that he found them during his search of Martinez's apartment. The prosecutor questioned Detective Gulbrandson about the "evidence bagging process." Defense counsel did not ask to conduct voir dire on the drug evidence and did not object to its admission.

¶ 54    Defense counsel did not oppose the admission of this evidence because the defense conceded that the drugs belonged to Martinez. The record does not reveal why defense counsel made this strategic concession. Instead, Martinez's theory of defense was that, although he possessed the drugs, he did not intend to distribute them.

¶ 55    Significantly, in her opening statement, defense counsel told the jury more than once that Martinez "admit[ted] that he possessed those drugs back on December 15th of 2021. That's not what this case is about. . . . He did not possess drugs with the intent to distribute." Defense counsel said that Martinez "accepts responsibility. He's the one that says yes, that's for personal use."

¶ 56    Although the mere "failure to make the timely assertion of a right," *Rediger*, ¶ 40, 416 P.3d at 902 (quoting *United States v.*

*Olano*, 507 U.S. 725, 733 (1993)), does not bar appellate review, the failure to object for a "strategic or other reason[]" precludes assertion of an argument on appeal, *Phillips*, ¶¶ 18-19, 443 P.3d at 1022-23.

¶ 57    Defense counsel's opening statement, if not an express waiver of Martinez's right to challenge the authenticity of the drug evidence, was at the very least an implicit one.  *See Rediger*, ¶ 42, 416 P.3d at 903-04 (acknowledging that a waiver may be express or implied).  The record shows that defense counsel made a strategic decision to concede that the drugs found in Martinez's apartment belonged to him and, instead, to argue to the jury that the prosecution had failed to prove beyond a reasonable doubt that Martinez intended to distribute them.  Consistent with this strategy, there was no reason to challenge the admissibility of the drug evidence or its authenticity.

¶ 58    In sum, we conclude that Martinez waived his right to contest the authenticity of the drug evidence.

### B.    Prosecutorial Misconduct

¶ 59    Martinez contends that the trial court plainly erred by allowing the prosecutor to engage in misconduct during voir dire by using

analogies that "trivialized the reasonable doubt standard." We discern no plain error.

### 1. Standard of Review

¶ 60    When reviewing prosecutorial misconduct arguments, "[w]e first determine whether the conduct at issue was improper based on the totality of the circumstances." *People v. VanMeter*, 2018 COA 13, ¶ 23, 421 P.3d 1222, 1229. Second, "we determine whether any misconduct warrants reversal." *Id.*

¶ 61    If the appellant "fail[ed] to object to the alleged misconduct at trial, we review for plain error." *People v. Ray*, 2025 COA 42M, ¶ 131, 575 P.3d 400, 435. "An error is plain if it is obvious, substantial, and so undermined the fundamental fairness of a trial as to cast serious doubt on the reliability of the conviction." *People v. Dominguez-Castor*, 2020 COA 1, ¶ 85, 469 P.3d 514, 529. "An error is obvious if it contravenes a clear statutory command, a well-settled legal principle, or Colorado case law." *People v. Valles*, 2025 COA 67, ¶ 10, 576 P.3d 740, 744.

## 2. The Trial Court Did Not Plainly Err by Allowing the Prosecutor to Use Reasonable Doubt Analogies During Voir Dire

¶ 62    During voir dire, the prosecutor distinguished reasonable doubt from "beyond all doubt."  She told the jury that the prosecution bore the burden to prove its case beyond "only a reasonable doubt" and was not required "to prove the case beyond any and all doubts."  The prosecutor then asked a juror how he might prove he drove to the courthouse.  After the juror said he would point to his parking stub, keys, and vehicle as evidence that he drove himself, the prosecutor asked the other jurors if it was "possible that [the first juror] got a ride."  After a second juror responded, "Sure," the prosecutor asked, "Is that likely, though?"  The second juror replied, "No."  The prosecutor then inquired, "Is it reasonable even?"  The second juror again replied, "[N]o."

¶ 63    The prosecutor then told the second juror that part of what the jury "look[s] to" is a witness's credibility and asked if the first juror seemed credible.  After the second juror answered, "Yes," the prosecutor inquired how other jurors made credibility determinations.

¶ 64    Turning back to the reasonable doubt standard, the prosecutor said, "That's the thing; you can have doubts. . . .  But if they're not reasonable based on the evidence that's presented, the law instructs you to convict someone if you're otherwise convinced that someone committed a crime.  That's basically what we're talking about here."  The prosecutor added that even "[i]f you're convinced[, . . .] you can still think of a possibility why what you're convinced about isn't correct that's not a reasonable doubt."

¶ 65    While we recognize that "[l]awyers and trial courts should avoid using analogies when explaining the concept of reasonable doubt to a jury," *Sauser*, ¶ 88, 490 P.3d at 1035, and that such analogies "can be problematic" and "trivialize the reflection and judgment" of the jury, *Dominguez-Castor*, ¶ 88, 469 P.3d at 529, employing a reasonable doubt analogy, without more, does not amount to plain error, *Sauser*, ¶ 88, 490 P.3d at 1035.

¶ 66    The prosecutor referenced the analogies only once during voir dire.  *See Dominguez-Castor*, ¶ 91, 469 P.3d at 529.  And during their closing arguments, both the prosecutor and defense counsel reiterated the correct reasonable doubt standard after the trial court had properly instructed the jury on the meaning of reasonable

doubt.  *See People v. Camarigg*, 2017 COA 115M, ¶ 52, 488 P.3d 267, 276 (concluding there was no harmless error where the jury was properly instructed on the reasonable doubt standard after the prosecutor used a puzzle analogy during voir dire).  We presume the jury followed the trial court's instructions.  *People v. Vialpando*, 2022 CO 28, ¶ 41, 512 P.3d 106, 115.

¶ 67    Moreover, Martinez does not point to, and we are unaware of, any published Colorado case holding that, in the absence of other trial errors, a prosecutor's reasonable doubt analogy during voir dire alone can amount to plain error.  *See Camarigg*, ¶ 53, 488 P.3d at 277; *Van Meter*, ¶ 32, 421 P.3d at 1230.  (To the extent that Martinez relies on *Vialpando* to argue that the brevity of his trial made the error more substantial, we are unpersuaded.  In *Vialpando*, ¶¶ 33, 40-46, 512 P.3d at 114-16, the supreme court acknowledged that a short trial may "compound the impact of any errors" but nonetheless concluded that, even when there were cumulative errors, including use of a reasonable doubt analogy during voir dire, such errors did not warrant reversal.  Furthermore, in *Vialpando*, the supreme court did "not decide . . . whether the trial court's use of reasonable doubt analogies during

29

voir dire is a separate ground for reversal." *Id.* at ¶ 41 n.2, 512 P.3d at 115 n.2.)

¶ 68     In the absence of a supporting "well-settled legal principle" or "Colorado case law," any error in allowing the prosecutor to use the reasonable doubt analogies during voir dire was not obvious, *Valles*, ¶ 10, 576 P.3d at 744, and, thus, not plain.

## C.     Aggravated Sentence

¶ 69     Lastly, Martinez argues for reversal of his aggravated sentence because the trial court, and not a jury, found that he was confined in community corrections. *See* § 18-1.3-401(8)(a)(IV), C.R.S. 2025. Under that statute, if a court "sentences the defendant to incarceration," it must "sentence the defendant to a term of at least the midpoint in the presumptive range but not more than twice the maximum term authorized in the presumptive range for the punishment of a felony" if "[t]he defendant was under confinement . . . in any correctional institution as a convicted felon." *Id.*

¶ 70     Martinez contends that, under *Apprendi* and *Blakely*, only a jury can make a finding of confinement for purposes of imposing an aggravated sentence. In *Apprendi*, the Court held that, under the

30

Sixth and Fourteenth Amendments, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 476, 490; *see also Blakely*, 542 U.S. at 302-03 (holding that the trial court erred because it — and not a jury — found that the defendant acted with "deliberate cruelty"); *Erlinger v. United States*, 602 U.S. 821, 835 (2024) (finding error when a trial court, rather than a jury, determined whether a defendant's prior convictions occurred on separate occasions).

### 1. Waiver and Invited Error

¶ 71     The People contend that Martinez is precluded from challenging his sentence under the doctrines of waiver and invited error, *see supra* Part II.A.4.a, because, during the sentencing hearing, defense counsel "expressly and repeatedly stated that [Martinez's] sentence was an aggravated range sentence with a minimum of eight years." We disagree.

¶ 72     At Martinez's sentencing hearing, the trial court, the prosecutor, and defense counsel agreed that the court was required to impose an aggravated sentence because Martinez was serving a

31

community corrections sentence for a prior conviction. Defense counsel noted Martinez's prior felony convictions and that he had pleaded guilty in a prior distribution case and "was sentenced to four years DOC and he had a drug sentence" to community corrections. Defense counsel said that "the minimum sentence is aggravated" and acknowledged that Martinez "underst[oo]d why the court may [have wanted] to go over the minimum sentence in this, but it[] [was Martinez's] position that since the minimum sentence [was] aggravated, eight years on this case [was] already going to be aggravated and [was] justified under the circumstances."

¶ 73　　The record "reveals no evidence, either express or implied," that, through defense counsel's statements, Martinez "intended to relinquish his right" to a jury trial on the fact of his confinement. *Rediger*, ¶ 42, 416 P.3d at 902. Instead, the record shows that Martinez's counsel argued for the lowest sentence she believed the trial court was authorized to impose. Martinez did not waive his *Apprendi* argument because defense counsel, like the prosecutor and the trial court, was apparently under the impression that the court could impose an aggravated sentence without a jury finding that Martinez was "under confinement." *See id.* at ¶¶ 43-44, 416

32

P.3d at 903 (holding there is no waiver when "neglect, not intent, explains [the] lack of an objection").

¶ 74     Moreover, "a sentencing court may not use a defendant's admissions to sentence him in the aggravated range unless the defendant knowingly, voluntarily and intelligently waives his Sixth Amendment right to have a jury find the facts that support the aggravated sentence." *People v. Isaacks*, 133 P.3d 1190, 1192 (Colo. 2006). Nothing in the record suggests that Martinez "knowingly, voluntarily and intelligently" waived his Sixth Amendment right to have a jury determine his confinement status.

¶ 75     Nor did defense counsel's failure to make an *Apprendi* and *Blakely* argument constitute invited error. Invited error "is a narrow doctrine and applies to errors in trial strategy but not to errors that result from oversight." *Rediger*, ¶ 34, 416 P.3d at 901. It "prevents a party from complaining on appeal of an error that he or she has invited or injected into the case." *Id.* The record shows that Martinez's failure to challenge his aggravated sentence arose from defense counsel's neglect or oversight. Accordingly, we reject the People's argument that Martinez's *Apprendi* and *Blakely* argument is barred under the invited error doctrine.

## 2. Standard of Reversal

¶ 76 The parties do not agree on the standard of reversal for Martinez's challenge to his aggravated sentence. While Martinez concedes that he did not preserve his challenge, he argues that preservation was not required because the "claim is made under Crim. P. 35(a)," citing *Fransua v. People*, 2019 CO 96, ¶ 13, 451 P.3d 1208, 1211, and, therefore, we must review de novo whether the trial court erred by not requiring a jury to find that Martinez was "under confinement."

¶ 77 We disagree that we should disregard the lack of preservation. Crim. P. 35(a) does not apply to challenges to a sentence's constitutionality. If presented in a postconviction motion, such an argument does not fall within Crim. P. 35(a) but, rather, under Crim. P. 35(c)(2)(I). *See People v. Collier*, 151 P.3d 668, 670 (Colo. App. 2006); Crim. P. 35(c)(2)(I) (addressing applications for postconviction review that allege "the conviction was obtained or sentence imposed in violation of the Constitution or laws of the United States or the constitution or laws of this state").

¶ 78 But this is a direct appeal. Courts may consider challenges to a sentence's constitutionality in direct appeals, as well as in Crim.

P. 35(c)(2)(I) postconviction proceedings.  *See People v. Elie*, 148

P.3d 359, 365-66 (Colo. App. 2006) (reviewing a defendant's

*Apprendi-Blakely* challenge to his sentence on direct appeal).  Thus,

we review de novo "whether the district court erred in applying the

law to defendant's sentence." *People v. Sandoval*, 2016 COA 19,

¶ 13, 488 P.3d 93, 101, *aff'd*, 2018 CO 21, 413 P.3d 1274.

¶ 79     If the trial court erred by not requiring that a jury find whether

Martinez was "under confinement," we must then consider whether

the error was plain.  *See Elie*, 148 P.3d at 366; *see also United*

*States v. Cotton*, 535 U.S. 625, 631-34 (2002) (reviewing an

unpreserved *Apprendi* violation for plain error); Crim P. 52(b).  As

noted above, an error cannot be plain if it is not obvious.  *See*

*Dominguez-Castor*, ¶ 85, 469 P.3d at 529.

¶ 80     In *People v. Crabtree*, 2024 CO 40M, 550 P.3d 656, the

Colorado Supreme Court held that an unpreserved trial error is not

reversible under the plain error standard unless the error was

obvious *at the time it occurred.*  *Id.* at ¶ 8, 550 P.3d at 661.  In

effect, *Crabtree* requires us, when examining an issue under the

plain error standard, to travel back in time to the moment of the

error.

### 3. Even if the Trial Court Erred, the Error Was Not Obvious at the Time of Martinez's Sentencing

¶ 81 Under *Crabtree*, we need not determine whether Martinez was entitled to have a jury determine his confinement status under *Erlinger* or any other case announced *after* his sentencing hearing.

¶ 82 Following *Crabtree*, we hold that, even if the court erred by not requiring a jury to determine whether Martinez was "under confinement," the error was not plain because we agree with the People that it "was not obvious, given the binding precedent established by" *People v. Huber*, 139 P.3d 628 (Colo. 2006).

¶ 83 At the time that the trial court sentenced Martinez, it was bound by the Colorado decisions instructing trial courts that they would not "run[] afoul of the *Apprendi-Blakely* rule" by making findings regarding a defendant's confinement and basing an aggravated sentence on that fact. *Id.* at 630; *see People v. Hines*, 2021 COA 45, ¶¶ 60-65, 491 P.3d 578, 589-90.

¶ 84 Because at the time of Martinez's sentencing, Colorado law permitted trial courts to impose aggravated sentences based on their own finding that the defendant was under confinement, any

error at Martinez's sentencing was not obvious and, therefore, not plain. Under the plain error standard, we must affirm the sentence.

### III.    Disposition

¶ 85    The judgment of conviction is affirmed.

JUDGE WELLING and JUDGE TOW concur.